NORMAN B. TOOKER et al.

v.

THE NATIONAL SUGAR REFINING COMPANY OF NEW JERSEY.

[Decided July 6th, 1912.]

1. Option agreements between the stockholders of three corporations and P., who was acting for H., the president of a fourth company, provided for the formation of a new corporation; that P. might elect to buy all the stock of the three corporations, payable in the preferred stock, at par. of the new corporation; that, after such election he should have a reasonable time in which to make the arrangements for the proposed new company, and the delivery of its preferred stock "in exchange for the stock of the sellers;" and that the stockholders should transfer to the proposed company direct the properties of their companies, payable in preferred stock at par. The new corporation was organized and a resolution adopted by the corporators, other than P., in their capacity as stockholders, and by the directors elected by them, other than P., authorizing the issuance to P., in payment of the stock of the other corporations, eighty-two thousand five hundred shares of preferred stock, the amount necessary under the option agreements for the acquisition of the stock of the other companies, and one hundred thousand shares of common stock which was transferred by P. to H.; the only consideration being his anticipated influence in preventing competition between the new company and the company of which he was president.—*Held*, that this issuance of the common stock could not be held valid, on the theory that P. purchased the stock of the old companies from the stockholders, and then sold it to the new corporation at a value acquired by its being then held as a whole; the plain construction of the option agreements being that the stockholders transferred their stock direct to the new corporation in exchange for its preferred stock, P. being merely a promoter.

2. P.'s failure to vote on the resolutions to purchase his stock, instead of validating the transaction, was a breach of trust. since not only was it a neglect of his duty, as director, towards the stockholders, but the option agreements themselves imposed a trust on him, the performance of which he could not delegate.

3. A sale to a corporation by a promoter and director, for $18,250,000. payable in stock of the corporation, of stock in other corporations purchased by him for $8,250,000, was void because a director cannot sell property to his company for a price in excess of its real value, and also because it violated Corporation act (*P. L. 1896 p. 293 § 48*). providing that nothing but money shall be considered as payment of any

part of the capital stock, except that property necessary for the corporation's business may be taken in payment of stock to the amount of the value thereof, and that, in the absence of actual fraud in the transaction, the directors' judgment as to the property's value shall be conclusive, since the conscious and intentional overvaluation of the stock in the other corporations was "actual fraud."

4. The gratuitous issuance of stock by a corporation, pursuant to resolutions adopted by the stockholders and directors, was not ratified by resolutions adopted at subsequent stockholders' meetings ratifying and approving the acts of directors and officers, since such issuance was contrary to the statute, and stockholders cannot ratify their own *ultra vires* acts, or the *ultra vires* acts of their directors, if not within the powers of the corporation.

5. Preferred stockholders of a corporation, who became such under an agreement with the promoter which made no reference to common stock, were not estopped to attack the issuance of common stock without consideration by a recital, in the certificate of incorporation, that the capital stock consisted of one hundred thousand shares each of common and preferred stock, and by their delay after knowledge of such recital in taking steps to cancel such common stock, since under Corporation act (*P. L. 1896 p. 283 § 18*), providing that the preferred stock of a corporation must not exceed two-thirds of its capital stock, the agreement with the promoter impliedly contemplated such common stock, and the preferred stockholders had a right to assume that it had been issued for value.

6. Stockholders of a corporation, by giving proxies to vote at stockholders' meetings to the directors and trustees, were not charged with knowledge possessed by such directors and trustees, where knowledge of the facts was being withheld from the stockholders by the directors and trustees themselves.

7. A delay of eleven years by stockholders in bringing an action to cancel stock issued without consideration does not prevent the granting of relief where stockholders had no knowledge of the facts during the interval, the stock is still owned by the original owner and his children, and his position has not been changed to his detriment in the meantime, especially where the transaction has never been fully consummated; the stock still being held by the president of the corporation as trustee for such owner.

8. Where the organizers of a corporation, acting as its stockholders and directors, voted to issue preferred and common stock, persons receiving such preferred stock in exchange for the stock of corporations absorbed by the new company were not precluded from attacking the issuance of the common stock as being without consideration, on the ground that the issuance of both kinds of stock having constituted a single transaction, the transaction was either wholly valid or wholly invalid.

9. Where the promoter of a corporation, to whom the entire common stock was issued, without consideration transferred a part of it to his agent who did the actual work of organizing the corporation, not in payment of his services, but purely as a gift, the transferee had no better title than the promoter.

10. As a general rule, where the jurisdiction of courts of equity and law is concurrent, if a recovery at law is barred by delay, no recovery can be had in equity.

11. Of the common stock of a corporation one thousand shares were lawfully·issued and subject to assessment, although not paid for. These shares were transferred to the promoter to whom the rest of the common stock was also issued without consideration. He subsequently transferred part of the shares to his agent who was president and director of the corporation. Subsequently, dividends having been declared each year for the full amount to which the preferred stockholders were entitled, two dividends were unanimously declared by the directors on the common stock, and more than six years thereafter suit was brought to cancel the stock and recover the dividends.—*Held,* that since, if the profits justified the dividends, the common stockholders would have been entitled to the full amount thereof on the stock lawfully issued, and since in his capacity as stockholder the promoter sustained no trust relationship towards the other stockholders or the corporation, and did not receive the dividends as trustee, but adversely to the corporation, the dividends could not be recovered from the promoter in equity after a recovery was barred at law.

12. While the president and director sustained a fiduciary relationship towards the corporation, directors having no right to unlawfully withhold dividends, and the dividends having been declared by the unanimous vote of the directors, the dividends paid to the president and director·could not be recovered.

13. In a suit to cancel stock issued without consideration, where a decree, recognizing the stock as valid but subject to assessment, would leave the corporation in the control of the holders of such stock, while a decree canceling the stock would be contrary to the mode provided by the Corporation act (*P. L. 1896 p.* 277) for the retirement of capital stock, the decree will recognize the stock as outstanding so far as the state or creditors are concerned, but will enjoin the corporation from paying dividends thereon, and the holders from voting thereon, except to vote to retire the stock in the mode provided by the Corporation act.

On final hearing on pleadings and proofs.

*Messrs. Lindabury & Faulks* and *Mr. William W. Porter,* for the complainants.

*Mr. Albert C. Wall, Mr. Henry B. Closson* and *Mr. John G. Milburn,* for the defendants Louisine W. Havemeyer and others.

*Mr. Walter D. Hines* and *Mr. Robert H. McCarter,* for the defendant James H. Post.

*Mr. John R. Hardin, Mr. Adrian H. Larkin* (of the New York bar), for the National Sugar Refining Company.

STEVENS, V. C.

This is a bill filed by Norman B. Tooker, executor of Nathaniel Tooker, C. A. Beamont and others on behalf of themselves and all other preferred stockholders of the National Sugar Refining Company of New Jersey, against that company and James H. Post and others, its directors, and against the executors and children of Henry O. Havemeyer, to require them to surrender the certificates for one hundred thousand shares of common stock of that company, or, in the alternative, to pay the face value thereof in cash, and also to require Mr. Post and the executors of Mr. Havemeyer to repay to the company the dividends that have been declared thereon.

The ground of the demand is that immediately upon the company's organization, its directors consciously overvalued the property purchased by it, and that Henry O. Havemeyer obtained the stock which represents the amount of overvaluation.

In May, 1900, the National Sugar Refining Company, the New York Sugar Refining Company and the Mollenhauer Sugar Refining Company were competitors of the American Sugar Refining Company, a much larger corporation, whose president was Henry O. Havemeyer. The competition was so injurious to the three companies first named that, during the year preceding, they lost heavily. James H. Post, one of the defendants, who appears to have had Havemeyer's confidence, was a member of B. H. Howell Sons & Company, commission merchants, engaged in the business of receiving sugars for sale on commission and selling the refined product. The individual members of this firm were interested in the National and Mollenhauer companies. In February or March, 1900, Post, with a view to improving the situation, began negotiations with the managers of the three companies. These negotiations, conducted ostensibly in the name of Post, were being directed by Havemeyer, who was not publicly mentioned, but who was, nevertheless, to be the sole beneficiary, so far as the common stock was concerned. On May 28th, 1900, Post procured written options, by the terms of which the stockholders of those companies

agreed to part with their several holdings in return for stock of a company to be formed—a company which would consolidate their interests and thereafter engage in friendly instead of destructive competition with the American company. In the result, the price at which these stockholders parted with their holdings, aggregated $8,250,000. The new company took their stock and paid for it in preferred stock, and it gave to Post for Havemeyer, in addition, $10,000,000 of common stock. The contention of the defendants is that Post bought the stock of the three companies for $8,250,000, and then sold it to the new company for $18,250,-000, which its directors adjudged and, as they assert, fairly adjudged, to be its value as one whole. Whether this contention has any foundation will depend upon the provisions of the options. As they lie at the root of the case and are identical in their essential features, I give, *verbatim,* the material parts of one of them:

"Agreement made and entered into in one or more parts, all to be taken as a whole, this twenty-eighth day of May, 1900, by and between James H. Post on behalf of himself and of such others as are associated with him, herein called the . purchasers, he being trustee for all, of the first part, and Mr. Claus Doscher, as representative for himself and others owning not less than two-thirds of all the stock of the New York Sugar Refining Company, herein called the sellers, of the second part.

"Witnesseth that in consideration of the mutual execution hereof, and of the agreements on the part of the several parties herein contained and particularly of the mutual execution hereof by and between the subscribers as stockholders of the said the New York Sugar Refining Company between themselves, the parties hereto have agreed and that they do hereby covenant and agree, each with the other, as follows:—

"I. The option herein provided for shall continue until May 29th, 1900, at twelve o'clock noon.

"II. On or before that date, the sellers will procure the holders of at least two-thirds of the stock and bonds of the said, the New York Sugar Refining Company to become parties to this agreement.

"III. The purchasers will, after two-thirds or more of such stockholders in par value shall have become parties hereto, upon notice to that effect, proceed to take the necessary steps for the organization of a new or the use of an existing corporation, under the laws of the State of New Jersey, with a capital of which ten million dollars ($10,000,000.) shall consist of preferred stock (with the right of votes) the preference being for cumulative dividends at the rate of six per cent. per annum, a preference as to capital as well: that is, in the final distribution of capital, preferred stock shall be entitled to preference, of which company the said James H. Post shall be the first president.

"IV. The sellers hereby confer upon the purchasers, the option down to May 29th, 1900, at noon, to elect to buy all the stock of the said The New York Sugar Refining Company which shall be subscribed hereto (to be not less than two-thirds of the entire capital) at the price of three million dollars ($3,000,000.) *payable in the preferred stock at par of a corporation to be formed* as hereinbefore provided. The sellers do not bind themselves to produce more than two-thirds of the total capital."

\*        \*        \*        \*        .\*        \*        \*        \*        \*

"VI. If the option herein provided for shall be availed of by the purchasers on or before May 29th, 1900, at noon, and notice to that effect be given to Mr. Claus Doscher, one of the sellers, at his office, No. 104 Wall St., New York, then and in such case, the purchasers shall have such reasonable time as may be necessary *for the arrangement of the proposed company and the delivery of its preferred stock, in exchange for the stock of the sellers.*

"The notice in writing above referred to shall be delivered to Mr. Claus Doscher at his office No. 104 Wall St., New York City, within the time specified, accompanied by a certified check for fifty thousand dollars ($50,000.) which shall be returned on payment of the purchase price, and which money shall be forfeited to the seller should the purchaser refuse to consummate the contract."

\*        \*        \*        \*        \*        \*        \*        \*        \*

"XI. As a guarantee by the sellers of the performance and to secure the performance on their part of the provisions of this agreement, their stock with all reasonable despatch and within six days after the exercise of such option by the purchasers, shall be endorsed in blank by them respectively and shall be deposited in trust with B. H. Howell Sons & Co., on their receipt.

"XII. Preferred stock of the proposed company not required to purchase the stock of the sellers may be issued for the acquisition of the stock of other sugar refining or collateral companies. All other preferred stock, not used for that purpose when issued, is to be issued for cash at par. Any amount received from it is to come into the treasury of the company."

\*        \*        \*        \*        \*        . \*        \*        \*        \*

"XIV. In the event that the sale herein provided for shall take place, *the sellers will at the request of the purchasers, transfer to the proposed company direct, the property of their company*, in addition to their stock at the option of the purchasers, by proper deeds or other instruments, containing covenants of warranty and further assurance, for the said sum, *payable in preferred stock at par as before mentioned.* \*  \*  \* The sellers will also procure the resignation of the directors and officers of their company in favor of nominees of the purchasers.

"XV. The stock which is to be sold to the purchasers is to carry with it all the property of the said The New York Sugar Refining Company, including good will, trade marks, patents, plant and all business appliances and other property of every description, with the exception of merchandise, cash supplies and money due from sales of merchandise,

except the amount of cash (one hundred dollars) to remain in the treasury, as above and except as hereinbefore provided. (The things thus excepted were under the provisions of Article 13 to be devoted to the payment of debts, etc.)"

\*     \*     \*     \*     \*     \*     \*     \*     \*

"XVII. All details necessary to carry out the agreement to complete consummation, *including details of the organization of the proposed company*, if the option shall be availed of, shall be agreed upon between Mr. Post as representing the purchasers and Mr. Claus Doscher as representing the sellers, and in the event of disagreement between them shall be determined in his absolute discretion by Mr.

"The date of sale is the date when the deed or transfers are finally delivered and consideration paid."

The option agreement is signed by Doscher and Post, in the case of the New York company; by Mollenhauer and Post, in the case of the Mollenhauer company, and by Post, Tooker, Bunker and others, in the case of the National company.

There is no uncertainty with respect to the meaning and design of these options. Post, although designated "purchaser," was, according to their terms, to be nothing more than the promoter of the new company, acting, as he says in his testimony, as agent for and under the directions of Havemeyer. Neither of these gentlemen became, in any proper sense, purchasers. The sole consideration for the stock of the old companies was to be the preferred stock of the new company. The new company, when formed, was to deal directly with the stockholders of the old companies. Their stockholders were to transfer to it their stock direct, and, if required, the property which the stock represented. The new company was to issue to each stockholder, individually, an exact equivalent for that which each individual gave. The options gave neither Post nor Havemeyer one dollar of interest in the new company except in so far as they or either of them might, as stockholders of the old companies, become entitled to their shares of the new preferred stock. What is specially noteworthy in these options is that not a word is said about the common stock, although it must have furnished the inducement to the plan.

I have been thus explicit in stating the position of Post and Havemeyer, because the argument on their behalf rests largely on the fallacious assumption that when the new company was or-

ganized they, as owners in their own right of the stock of the three companies, had something to sell to it, viz., that stock taken as one whole—more valuable on that account. On the contrary, they had nothing to sell; they were not vested with the legal or equitable title; they were not even its custodians, while the organization of the new company was proceeding.

Article 11 provided that as a guarantee by the sellers of the performance of the agreements on their part they, the sellers, were, within six days after the acceptance of the option, to endorse their stock certificates in blank and deposit them in trust with B. H. Howell Sons & Company. So, that B. H. Howell Sons & Company were to be custodians and not Post. Neither Havemeyer nor Post was to pay one penny for the stock thus deposited, nor did they pay one penny. Post was indeed to hand over to the sellers a certified check for $50,000, but this was to serve as a guaranty merely, to be returned to him when the new company's stock was issued.

After the options had been accepted by Post he proceeded to organize the National Sugar Refining Company of New Jersey in accordance with their terms. Havemeyer's name was not mentioned. The evidence indicates that there was, for some reason, a general disposition not to mention it. Havemeyer's office was alluded to as "the corner," because on the corner of Sixth and Wall streets. He himself had no direct communication with any of the sellers and did not appear at any of the organization meetings.

The certificate of incorporation of the National Sugar Refining Company of New Jersey bears date May 31st, 1900. Its authorized capital stock was $20,000,000, of which $10,000,000 was to be preferred and $10,000,000 common. The organizers met on June 2d, 1900. There were present Messrs. Post, Mollenhauer, Howell, Cory and Bunker. After the by-laws had been adopted, they proceeded to an election of directors. Those chosen were the gentlemen above named, and, in addition, Messrs. Doscher and Mollenhauer, all of whom had previously been approved by Havemeyer. Then Mr. Post retired from the meeting. What followed I state in the words of the minutes:

"On motion of Mr. Howell it was by unanimous vote of all the stockholders (except James H. Post not voting) resolved that this company do purchase from James H. Post all the following shares of stock and other property, to wit, 10,000 shares of The National Sugar Refining Company; 10,000 shares of the Mollenhauer Sugar Refining Company; 6,000 shares of the New York Sugar Refining Company and the three per cent. bonds of the said New York Sugar Refining Company of the par value of $2,400,000, and issue therefor to said James H. Post 182,500 shares of the capital stock of this company, of which one hundred thousand shares shall be common and 82,500 shares shall be preferred stock, and the board of directors are authorized to proceed to consummate such purchase and to issue certificates for the said shares of stock accordingly, such shares to include the shares subscribed for in the certificate of incorporation."

The stockholders' meeting then adjourned, and was followed by a directors' meeting at which substantially the same resolution was adopted, Mr. Post, having as before retired while it was being considered and passed. This resolution, however, contained the added statement that the price of $18,250,000 was, in the judgment of the board, the value of the property purchased. It was further directed that the stock should be issued and delivered to Post.

I stop to make some observations at this point.

*First.* All the stockholders of the new company are said to have voted unanimously to purchase the shares and other property from Post. The only stockholders at that time were Messrs. Post, Mollenhauer, Howell, Cory and Bunker who had each, on May 31st, 1900, subscribed for two hundred shares of the common stock, making an aggregate of $100,000, none of which had then been paid in.

*Second.* Post is said to have retired from the meeting when the subject of his proposal was under discussion. His absence, so far from validating the transaction, was in itself a breach of trust, not only for the reason that in the language of Mr. Justice Dixon in *Stewart* v. *Lehigh Valley Railroad, 38 N. J. Law (9 Vr.) 505, 523,* "he could hold against the stockholders no advantage that he had got through his neglect of duty toward them," but for the additional reason that the options themselves imposed upon him a trust, the performance and responsibility of which he could not delegate to others.

*Third.* Post, at these meetings, assumed to be the owner of the stock of the old companies. In point of fact, as I have already said, he, personally, had nothing to sell. The options provided, in unambiguous language, that the several stockholders of the old companies were to deal with the new company direct. By section 3, Post was to organize a new company or to use an existing one; by section 4, the price of the stock of the old companies was to be paid by the preferred stock of the new; by section 6, the transaction was designated as an *exchange* of the preferred stock for the stock of the sellers; by section 14, it was provided that

"the sellers will at the request of the purchasers transfer to the proposed company direct, the property of their company * * * payable in preferred stock at par as before mentioned,"

and the final clause provided that the date of sale was "the date when the deeds or transfers are finally delivered and consideration paid."

*Fourth.* If Post had really purchased the stocks of the several companies at the price of $8,250,000 and had really paid for them with his own money, he could not have resold them to the new company for $18,250,000. The properties would have been consciously overvalued and the attempted sale would have been, according to *Eastern National Bank* v. *American Brick Co., infra,* not voidable but absolutely void. The reasoning of Vice-Chancellor Pitney, in *See* v. *Heppenheimer, 69 N. J. Eq. (3 Robb.) 42,* is conclusive on this head, and I shall not here repeat it. The transaction would have been void because it violated the statute, and it would also have been voidable under the rule of *Gardner* v. *Butler, 30 N. J. Eq. (3 Stew.) 702,* which denies to a director the right to bargain with his company for a price in excess of the real value of the thing sold.

It cannot be disputed that when the options provided that Post should form a new company "under the laws of the State of New Jersey," they required Post to proceed according to the prescriptions of those laws. Section 48 of the Corporation act prescribes "that nothing but money shall be considered as payment of any part of the capital stock * * * except as hereinafter provided." The proviso is that

"any corporation formed under this act may purchase mines, manufactories or other property necessary for its business, or the stock of any company or companies owning mining, manufacturing or producing materials or other property necessary for its business, and issue stock to the amount of the value thereof in payment therefor, and the stock so issued shall be full paid and not liable to any further call, neither shall the holders thereof be liable for any further payment under any of the provisions of this act; and in the absence of actual fraud in the transaction the judgment of the directors as to the value of the property purchased shall be conclusive."

These sections have been so often construed by our highest court that their meaning is not open to question. I need only refer to the leading cases of *Wetherbee* v. *Baker, 35 N. J. Eq. (8 Stew.) 501; Donald* v. *American Smelting Co., 62 N. J. Eq. (17 Dick.) 729; Volney* v. *Nixon, 68 N. J. Eq. (2 Robb.) 605; See* v. *Heppenheimer, 69 N. J. Eq. (3 Robb.) 36; Easton National Bank* v. *American Brick Co., 70 N. J. Eq. (4 Robb.) 722.* They all hold that the stock must be paid for in money or money's worth, and that any conscious or intentional overvaluation is actual fraud, within the meaning of the sections quoted.

Section 18 of the Corporation act provides that

"at no time shall the total amount of the preferred stock issued and outstanding exceed two-thirds of the capital stock paid for in cash or property."

When the options authorized the formation of a new company, they necessarily authorized its formation subject to this provision. When, therefore, $10,000,000 of preferred stock was provided for, at least $5,000,000 of common stock must also have been provided for. It was, therefore, quite within the authority of the directors to have issued $5,000,000 or $10,000,000 of this stock, but they must have issued it for money or money's worth. The vice of the transaction lay not in its issue but in its issue as a gift to Havemeyer.

*Fifth.* The reason for its issue is apparent. As I have already said the three companies were engaged in a disastrous competition with a more powerful rival. They were losing money. If their stockholders could get back the money which they had invested in their plants and a reasonable profit beside, they would

more than avert loss. As a business proposition ·the plan had much to recommend it. The organizers were experienced men, intent upon guarding their own interests and those of the other stockholders of the old companies. They were to get preferred stock in a company, free from mortgage—a company which they were themselves to manage, at least during the pleasure of Havemeyer; the dividends were to be cumulative and in the event of a dissolution the preference was to extend to principal as well as interest. It is true that the controlling power was to be Havemeyer, but the very fact that he held the common stock was a guaranty that the company's interest would be attended to, and that the competition with the American company would not be destructive. That their expectations were justified by the event, appears from the fact that within four years after the organization, Havemeyer received in dividends on the common stock $2,500,000; that for twelve years there has been no default in the payment of the dividends on the preferred stock, and that the company now has a surplus. If I had merely to pass upon the wisdom or unwisdom of the transaction, from the standpoint of benefit to the old stockholders, I should not hesitate to conclude that the bargain was a good one. The agreement that Post for Havemeyer was to have common stock was of course known to the promoters of the arrangement, but the amount of it was not announced, even to them, until after the options were signed. The options, as I have ·said, do not mention common stock. Post says that he suggested to Havemeyer that the issue should be $5,000,000, but that Havemeyer objected and said he wanted it fixed at $10,000,000, and that that fixed it. The announcement of the amount was first made on June 2d, the day of the organization meeting. Plainly Havemeyer fixed it at that sum because he wanted control.

*Sixth.* It is said that there was some discussion at the stockholders' and directors' meeting of the · value of the combined plants taken as a unit from Post as seller. It was at best, perfunctory, for evidently everything but the amount of the common stock had been settled beforehand, and the question of amount was not settled by the directors but by Havemeyer. ·

They would, no doubt, have settled it at $5,000,000, as Post suggested, had Havemeyer so directed.

It is incontestable that Havemeyer acquired the $10,000,000 of common stock without tangible consideration moving from himself—either money or property. He received it only because he was president of a powerful competitor; able, through his acts and influence, as was thought, to make the new organization a paying concern. He did not *bind* himself to exert this influence, but the directors relied upon his self interest.

It is plain that the transaction could have been enjoined *in fieri*. It could also have been attacked with success, after the stock had been issued, for the reason that there inhered in it the actual fraud referred to in section 49 of the Corporation act. That fraud consisted, as I have shown, in issuing the stock for a consideration that was neither money nor property; and in covering up the gift by a seeming sale, at a conscious overvaluation, of that of which neither Post nor Havemeyer was, in point of fact, the owner.

It is argued, however, that conceding that the transaction was unlawful in the beginning it was permitted to stand without objection for ten years and a half; that during that period the stockholders, by resolution, ratified it; that they are now estopped from questioning it, and that in any event they are barred by laches and by lapse of time.

The defence of ratification may easily be disposed of. In 1905 and subsequently at the annual meetings of the stockholders, the following resolution was passed:

"*Resolved*, that the stockholders hereby ratify and approve all the acts of the directors in the management of the company's business and the conduct of its officers and their action generally down to and including the present time."

It might, perhaps, be open to question whether, properly interpreted, this resolution could be held to include the acts of the stockholders and directors in organizing the company and issuing its stock, but assuming that it could, it is evident that it was without effect. Stockholders cannot ratify their own *ultra vires* acts, neither can they ratify the *ultra vires* acts of their

directors unless they are *intra vires* the corporation. They can- not make lawful, acts which the statute has declared to be unlawful. *Breslin v. Fries-Breslin Co., 70 N. J. Law (41 Vr.) 283; Siegman v. Electric Vehicle Co., 72 N. J. Eq. (2 Buch.) 409.*

In considering the question of laches we must revert to the options. Article 3 stipulated that

"the purchasers will, after two-thirds or more of such stockholders, (*i. e.*, the stockholders of the three old companies) in par value, shall have become parties thereto, upon notice to that effect, proceed to take the necessary steps for the organization of a new or the use of an existing corporation under the laws of the State of New Jersey with a capital, of which ten million dollars shall consist of preferred stock (with the right to vote) ; the preference being for cumulative dividends at the rate of six per cent.," &c.

This article contemplates the issue of common stock, but only by implication. As the company was to be organized under New Jersey law, and as that law requires (section 18 of the Corporation act) that

"at no time shall the total amount of the preferred stock issued and outstanding exceed two-thirds of the capital stock paid for in cash or property,"

it was a necessary part of the scheme, if it was to be a legal scheme, that the common stock would not be less than $5,000,000 (the preferred stock having been fixed at $10,000,000), and that it would be paid for in money or property, dollar for dollar. When, therefore, the preferred stockholders were informed by the certificate of incorporation that the amount of the total authorized capital was $20,000,000, divided into two hundred thousand shares, of which one hundred thousand were to be shares of common stock, and when they read on their stock certificates that the common stock was $10,000,000, they would naturally have supposed that the common stock had been issued for the equivalent which the law prescribed. Neither of these papers gave them any notice or information to the contrary. Those of the stockholders who were incorporators and directors knew the facts, for they were parties to the organization, but,

with one or two exceptions, none of the others knew or were informed of them. I think I do not overstate the case when I say that the fact that the stock had been given to Mr. Havemeyer was kept secret. Up to the time of his death Mr. Post stood on the books as its sole owner. Neither by circular, announcement at any stockholders' meetings, nor in other ways were the body of the stockholders informed of the circumstances. Post, their president and trustee, did not see fit to make any explanation or disclosure.

This is conceded, but it is said that the stockholders knew facts which should have put them upon inquiry, and that if they had made the inquiry they would have learned the truth. What facts did they know?

They knew what the option agreement told them, but it told them nothing about the common stock. When they exchanged the old certificates for the new at B. H. Howell Sons & Company's office, that office gave them no additional information. When they were asked to sign proxies, the proxies gave them none. But it is said that the persons who held the proxies knew and the stockholders are affected by their knowledge. This knowledge was the very knowledge which the proxies, their directors and trustees, were withholding from them. The proxies merely authorized the persons named in them to vote for directors, and in the transaction of such other business as might otherwise properly come before the meeting. How so limited an authority could affect them with knowledge—more especially as it is not pretended that the facts were stated at any stockholders' meeting—I cannot understand.

Then it is said that if they had looked at the books, which were open to them, they would have learned the facts. The first entry, made under date of June 1st, 1900, shows that the sum paid for the stock of the three companies was $8,250,000. This so far from indicating a purchase for $18,250,000, indicates the contrary. It shows a purchase for the sum for which they really were purchased. Then we find, further on, an item "assets (entered by order Pres. & Treas.) $10,000,000." This was a misleading entry. If it really stood for anything, it stood for "Havemeyer's anticipated influence," but to a stockholder

looking at the books, and remembering that on his stock certifi-cate it was written that the authorized common stock was $10,000,000, it might have been taken to mean that common stock to the amount of $10,000,000 had been subscribed for as the law required—not necessarily paid in, but standing there as an obligation of the subscribers to respond to assessments whenever called for. The subscriptions would be genuine assets.

It is further said that the reports filed annually with the state board of assessment would have disclosed the fact. Among the questions asked and answered in the first report (and in the others they are very similar) were the following:

"1. What is the amount of your capital stock authorized?
"$20.000,000.
"2. Into how many shares is it divided?
"100,000 common, 100,000 preferred.
"3. How many shares are fully paid, either in cash or by property purchased?
"199,785.
"4. How many shares are partially paid?
"None.
"5. What is the amount of your capital stock issued?
"$19,978,500."

Now if we assume, what I do not understand to be the law, that these reports are, through filing merely, constructive notice of their contents to every stockholder, they fail to give him any notice of any fraudulent act. They do not show that stock to the amount of $19,978,500 (which includes the McCahan stock purchase, to which I have not heretofore found it necessary to allude), was issued contrary to law. On the contrary, taken in connection with the book entries to which I have referred, they suggest that the common stock had been fully paid, in money or property, in the manner prescribed by law. I fail to find that any fact which came to the notice of the stockholders, or which they may be presumed to have known, was of a character to put them on inquiry. There being on their part no knowledge, and on the part of Havemeyer no change of position to his detri-ment, there can be no laches and therefore no estoppel.

Is then lapse of time a bar? Havemeyer and his estate, so far from being worse off to-day because of his ownership of the

stock are better off. He has received dividends in money to the amount of $2,500,000, and has paid out nothing. There is no inequity, therefore, in holding that the stock, void in its origin, has continued void for a period of eleven years and is now void in the hands of the original holder and his children. Nothing is better settled than that mere lapse of time does not operate as a bar, in a matter exclusively cognizable in equity, unless the time be much longer than that. Says Pomeroy (*2 Eq. Jur.* § *917*):

"No lapse of time, no delay in bringing a suit, however long, will defeat the remedy provided the injured party was during all this interval ignorant of the fraud. The duty to commence proceedings can arise only upon his discovery of the fraud, and the possible effect of his laches will begin to operate only from that time."

But the case presents this rather singular situation. The defendants are Post, Havemeyer's children, and the company itself. The stock stands and has always stood on the company's books in the name of Post. For whom does he hold it? He is, according to his evidence, trustee for Havemeyer; but, as president and director, he is also, in a sense, trustee for the stockholders. Havemeyer's children have filed a cross-bill asking that the company and its officers be directed to transfer the stock to them.

Under the case of *Volney* v. *Nixon, supra,* no relief can be granted to the Havemeyers. They, necessarily, stand in the position of asking the court to give them the same kind of relief that was refused in that leading case. If their title does not admit of legal vindication, and if Post himself disclaims beneficial ownership (except as to a small proportion of the shares, as to which I will speak hereafter), the objection that the court should not now interfere, because of lapse of time, seems considerably weakened. A very important part of the transaction (looked at from the Havemeyer standpoint) has not been completely consummated.

I shall briefly notice one or two other points strongly insisted upon by the defendants' counsel, but arising out of a view of the evidence that is entirely inadmissible. It is said that inasmuch

21

as the transaction was single, the court cannot now divide it; cannot sustain it in part by holding the issue of preferred stock good, and reject it in part by holding the issue of common stock bad, the general rule being, in the words of Vice-Chancellor Emery, in *Sivin* v. *Mutual Match Co., 72 N. J. Eq.* (*2 Buch.*) *579*, "that stockholders in the same default or participating in an alleged illegality or fraud are estopped from obtaining a decree even in right of the company."

It is evident that the rule here invoked is inapplicable. It is only by regarding the form and not the substance of the matter that the argument has any plausibility. The argument fails altogether to take into account the provisions of the option agreement, which Post was bound to give effect to. It is based, too, upon the assumption that Post had something to sell. As we have seen, he had nothing. If he had been the actual owner of the stock of the three companies and had, as owner, sold it partly for preferred, and partly for common stock, the case would have been quite different. But the stockholders of the old companies were the owners, and they got only that which under the options they were entitled to, while Post, for Havemeyer, got that to which he had no legal right.

I have hitherto in the course of this discussion treated the common stock as being wholly Havemeyer's. Post says that Havemeyer made it plain to him at the outset that he was to have no part of it. In December, 1901—that is, a year and a half after the organization—Havemeyer handed him a paper (Exhibit D, page 125 of printed record) in which, among other things, it was stated that Havemeyer and Palmer had issued certain certificates, and among them one for five thousand shares to Post. This is the evidence:

"*Q.* What did Mr. Havemeyer say when he gave it to—when he gave you this declaration that he held five thousand shares? *A.* He said that I had been very satisfactory; · I had attended. to the business and I hadn't had any salary; under the agreement I wasn't to have any, but I was to do the commission business. He would put aside this stock for me. He sealed it up in an envelope and said 'You put that away and in five years we will adjust it. "

\*          \*          \*          \*          \*          \*          \*          \*          \*

"*Q.* Did Mr. Havemeyer pay you anything for your services in this matter in which you were acting for him? *A.* He did in 1901 give me the stock, but it was not in payment for those services. The payment for the services, as I understand it, was the contract with B. H. Howell Sons & Co., for a period of five years—was the consideration that I received for my firm in connection with the organization of this company. *Q.* That is for the services you did in connection with the organization you were compensated by the Howell contract? *A.* That is the way I understood it at that time."

On this evidence it seems clear that Post neither received nor was entitled to any of the stock for his services as promoter; that he got his compensation for promotion out of the B. H. Howell Sons & Company contract, which gave him the commission business of the new company.

Under these circumstances Post, as Havemeyer's subsequent donee, does not stand on any higher plane than Havemeyer himself.

I now come to the question of dividends. In 1903 the company declared a ten per cent. and in 1905 a fifteen per cent. dividend upon the common stock. The bill prays that the executors of Mr. Havemeyer be decreed to repay the money. If the original issue was void as against the company, it would seem necessarily to follow that there was nothing on which to base the payment of the dividends, and that they could have been recovered in an action at law for money had and received at any time within six years after their payment. In the *Easton National Bank Case,* already referred to, the court of errors and appeals said that no bill was needed to set aside a transaction involving a fraudulent issue of stock; that it was void *ab initio,* and that the appropriate relief could be given on that assumption. The dividends now in question, two in number, were declared and paid more than six years before the filing of the bill. They could not have been recovered in an action at law (*Freeholders of Somerset* v. *Veghte, 44 N. J. Law (15 Vr.) 509),* and the question is can they now be recovered in this court, the general rule being that where the jurisdiction is concurrent, in this respect as in many others, equity follows the law. *Kane* v. *Bloodgood, 7 Johns. Ch. 90.*

It is a matter of importance to get at the exact situation. The certificate of incorporation states that Post, Mollenhauer, Howell, Cory and Bunker each subscribed for two hundred shares of the common stock, that is, to $100,000 of stock in the aggregate. On June 2d, 1900, stock certificates were actually issued to the subscribers for the amount subscribed. The certificates of Mollenhauer, Howell, Cory and Bunker were almost immediately assigned to Post and were a few days afterward (June 8th) included in the receipt given to him by John E. Parsons, Mr. Havemeyer's counsel. Mr. Post says, somewhat obscurely (at p. 433):

"The first subscriptions for common stock were made in connection with the incorporation. When the vote was about to be made in regard to issuing it all to me for the other stock, it was decided to have the directors qualify by preferred stock."

This may have been said in conversation among some of the directors, but there was no corporate resolution regarding it. All that is shown by the minutes is that, in the course of the directors' meeting, "the following subscription list was received and accepted and ordered to be entered in the minutes." Then the minutes recite an undertaking on the part of each of the incorporators to subscribe for ten shares of the preferred stock. It is not said that they took this stock in substitution for the common stock subscription. The fact is undisputed that they organized in their character of common stockholders. On no other basis could the organization have been effected. All that appears is that at the directors' meeting, held after the stockholders' meeting had adjourned, they made an additional subscription for preferred stock. And the reason is obvious. Havemeyer wanted all the common stock, and, as to the directors, they did not care whether they sat in the board by reason of a common stock qualification or a preferred stock qualification. What I desire to emphasize is, that conceding that the so-called sale of the stocks of the old companies to the new was fraudulent and void, and that Havemeyer acquired no title thereunder, there was still a lawful issue of common stock to the amount of $100,000. This stock stands, in my view, as having never been

paid for. But it was, notwithstanding, stock properly sub-. scribed; lawfully issued; still outstanding and now subject to assessment. It seems inevitably to follow that whatever may have been or may be the status of the other stock, there could have been a dividend declared on this stock in the years 1903 and 1904, and there would have been nothing illegal, if the profits earned justified it, in making to its owners dividends of exactly the same amount as were actually made on the ten millions of stock; for it would have represented exactly the same property as the one hundred thousand shares would have done, if they all had been lawfully issued.

The preferred stockholders having received all the distributable earnings they were entitled to under the options and stock certificates, the common stockholders would have been entitled to the rest; and so the objection to the dividends (unanimously concurred in) would seem to relate rather to the false assumption implied in the resolution than to the ultimate right. Whether, in view of the resolutions of ratification, the decision of the court of errors and appeals, in *Breslin* v. *Fries-Breslin Co.*, *70 N. J. Law (41 Vr.) 274*, would prevent a present recovery of the dividends, if they had been declared within six years before the commencement of this suit, I need not decide. What I am now concerned with is the question whether Post or Havemeyer, as to these dividends, stands toward the preferred stockholders as trustees, unable to take advantage of the bar of the statute. Havemeyer received the dividends on ninety-five thousand shares of stock and Post upon five thousand. Havemeyer was neither a director nor officer. As equitable owner of the thousand shares originally subscribed he sustained no relationship of trust either to the company or its stockholders. *United States Steel Co.* v. *Hodge, 64 N. J. Eq. (19 Dick.) 807, 813; Lillard* v. *Oil Company, 70 N. J. Eq. (4 Robb.) 205.* He died in 1907. His estate has presumably been administered according to the directions of his will. He and his executors have for seven years held the dividends, not as trustees, but adversely. He would have been entitled to them under a resolution properly framed. There seems, therefore, to be no equity in holding him

bound to refund the money, after the bar of the statute has attached at law.

As to Post, the case is not quite so strong. He was president and director. Whether the relationship of a director of a manufacturing company to his stockholders (*3 Thomp. Corp.* § *4128*) is similar to that of the managers of a savings bank to their depositors (*Williams* v. *McKay, 40 N. J. Eq. (13 Stew.) 189*) or the directors of a building loan association to their stockholders, so called (*French* v. *Armstrong, 79 N. J. Eq. (9 Buch.) 289*, need not be decided. If the law be that, notwithstanding that he is not clothed with the legal title, he is, in general, subject to the liability of the trustee of an express trust, and cannot claim the benefit of the statute for that reason, the principle should not be carried to an extreme. The statute declares that the directors of every corporation shall

"after reserving over and above its capital stock paid in as a working capital for said corporation such sum, if any, as shall have been fixed by the stockholders, declare a dividend among its stockholders of the whole of its accumulated profits, exceeding the amount so reserved, and pay the same to such stockholders on demand."

While the directors are vested with a discretionary power with regard to the time and manner of making distribution of these profits, they may not improperly withhold them. *Laurel Springs Land Co.* v. *Fougeray, 50 N. J. Eq. (5 Dick.) 757; Stevens* v. *United States Steel Corporation, 68 N. J. Eq. (2 Robb.) 373.* Such being the law, and Post having at least a qualified interest to share in the earnings, and having, with the unanimous consent of the directors, received his fair proportion of them, and the statute having run against him in the law courts where he might have been sued, it would seem that equity should not deny him that measure of protection which he would receive there. As to this money, the position of its recipient has almost necessarily changed.

It must be remembered, too, that this is a suit by the preferred stockholders of a solvent and going concern, not the suit of a receiver seeking to recover, for the benefit of creditors, a trust fund wrongfully depleted. These stockholders at the beginning agreed

that the surplus earnings should, after their shares were allotted to them, go to the common stockholders—I say "agreed," for the law under which the corporation was organized required the presence of common stockholders and gave to these stockholders a right of participation in the surplus such as I have mentioned. There is no question of impairment. If there had been no common stock, lawfully issued, or if that which had been issued had been held by persons other than Post or Havemeyer, a very different question might have arisen.

1 now come to the question of relief. What, under the decisions, is the present status of the stock unlawfully issued to Post for Havemeyer? There are several decisions of the Court of Errors and Appeals bearing on this question.

In *Knickerbocker Improvement Co.* v. *Board of Assessors, 74 N. J. Law (45 Vr.) 583,* it was held that whether stock is issued for value or not, the subscription fixes the basis of the tax. The court found, as a fact, that there was *not* a *bona fide* value; nothing but a semblance of it. They nevertheless held that the company was taxable on the entire amount of stock issued.

In *See* v. *Heppenheimer, 69 N. J. Eq. (3 Robb.) 36*—a case not unlike the present in several of its leading features—stock issued at a conscious overvaluation was held by Vice-Chancellor Pitney to be assessable in favor of creditors.

In *Bigelow* v. *Old Dominion Copper Co., 74 N. J. Eq. (4 Buch.) 502.* Chancellor Pitney said that where a promoter takes a profit in the form of shares that represent neither money nor property and exceed the reasonable services and expenses of the promoter, while he is liable to refund the shares for the proceeds of the sale of them "he is also liable under the statute as for unpaid subscriptions."

In *Easton National Bank* v. *American Brick and Tile Co., 70 N. J. Eq. (4 Robb.) 722,* the court of errors and appeals found as a fact conscious or intentional overvaluation. They said that the transaction was not only voidable but void, and yet they held that the stock which had been issued as full paid, was liable to assessment to satisfy the demands of creditors.

In the last-cited case it had been contended that no assessment could be made while the contract stood intact. This was on the

theory that the transaction was only voidable and that a bill must first be filed to avoid it. In answer to this contention, Chancellor Pitney, speaking for the court, said: "In our view this whole difficulty is imaginary. Assuming the case showed a contract between the company and its stockholders that the stock certificates should be issued as full paid, and as for property purchased, and that this contract was in fact of such a character and made under such circumstances that it contravened the prohibition of the Corporation act, it was not merely voidable but void. It had as little effect for any purpose as the contract that was before this court in *Volney* v. *Nixon, 68 N. J. Eq. (2 Robb.) 605*, and could not be laid hold of by either party as a ground of action or ground of defence. No bill or other original proceeding was necessary to procure an adjudication of its nullity, and the court on the petition originally filed by the receiver for the purpose of enforcing the liability of the stockholders for the unpaid portion of their subscriptions, upon ascertaining the fact that rendered the so-called contract void, was at liberty to treat it as affording no obstacle to the relief prayed by the receiver."

Now, it might be suggested that the court was inconsistent in holding that although the subscription agreement was absolutely void, the issue of stock founded upon it was so far valid as to afford a basis of taxation and a basis of assessment for the benefit of creditors. On the other hand, it might be said that while the contract, pursuant to which the stock was issued, was void, the implied agreement springing out of the acceptance of the stock certificate was enforceable on the theory of *Handley* v. *Stutz, 139 U. S. 427*, viz., that the acceptance of a certificate is sufficient evidence of an agreement to pay its par value. But this, as it seems to me, would be contrary to *Volney* v. *Nixon, 68 N. J. Eq. (2 Robb.) 605*, where it was held that a contract between two persons to divide stock to be issued in excess of the value of the property for which it is to be issued, is illegal and will not be enforced by the courts. It seems quite impossible to divorce the issue of the certificate from the agreement on which alone its issue was based. The true reason for the decisions is, I think, that stock being the representative of money or money's worth, and being held out as such, the public have the right to deal with the corpo-

ration on that assumption. Hence, the holders of the stock certificates are estopped as against the state, in a case of taxation, or as against creditors, in a case of insolvency, to deny the validity of the issue. In other words, the issue is unlawful, but the certificate holders are not in a position to say that it is.

In *Knickerbocker Improvement Co.* v. *Board of Assessors, supra,* a tax case, Judge Dill said: "Stock once issued is and remains outstanding until retired and canceled by the method provided by the statute for the retirement and cancellation of capital stock." In *Stephany* v. *Marsden,* 76 *N. J. Eq.* (*6 Buch.*) *612*—the case of a solvent and going concern—on bill filed by a stockholder to compel the surrender and cancellation of shares said to have been fraudulently issued, both this court and the court of errors and appeals held that the proof of fraud failed; but in the *per curiam* opinion of the Court of Errors and Appeals this statement was made: "Where stock is fraudulently issued for property purchased, in excess of the value of that property, it may well be doubted whether the remedy is to compel the surrender and cancellation of the stock. Such a method of reducing capital stock is not that provided by the Corporation act and to permit its adoption might seriously affect the rights of creditors." The point was not decided, but the suggestion is in line with that made by Judge Dill in the tax case. What then is the relief to be given?

*First.* The decree might declare merely that the stock not being full paid, is liable to assessment for its face value. But this would recognize it as lawful and would, for all practical purposes, leave the company in control of those who now own it. A single share of preferred stock would give them a majority of the whole number of shares. It would besides entitle them to dividends. Such a declaration by the court would be important only in case of insolvency. The remedy would plainly be inadequate.

*Second.* The court might decree in the alternative, as suggested by counsel on the argument, that the stock be surrendered or that it be paid in full. But this would be either to legalize it, or, in case of non-payment, to decree contrary to the utterance

of the Court of Errors and Appeals as to the effect of the statutory provision for retirement.

*Third.* The decree might direct an, inquiry to ascertain whether, if the stock were ordered to be surrendered and canceled, creditors would be injured. If the inquiry showed that they would not, then the issue might be canceled with a reservation as to existing creditors. This course would not harmonize with the above-mentioned utterance.

*Fourth.* The only other remedy that suggests itself to me is that while recognizing the stock as actually outstanding, as far as the state or creditors may be concerned, its holders should be enjoined from voting on it, except as mentioned below and the company from paying dividends on it. It is, however, obvious that a decree which would prevent Post and the Havemeyer estate from enjoying the benefits of stock ownership, and would yet hold them liable for all time, to creditors present and future to the amount of ten millions of dollars, would be unjust. The decree ought, therefore, to give to the Havemeyer interests and to Post the right to vote to retire the stock in the manner prescribed by law. How far, if at all, section 18 of the Corporation act—the section that prescribes that the preferred stock shall not exceed two-thirds of the capital stock—may interfere with retirement, . and how far it may be necessary for the company so to proceed as to make its stock issue comply with legal requirements, I shall not undertake to decide. The question has not been argued; is not within the issues presented by the pleadings and may not require judicial decision.

Such adjustments may be made by the parties concerned as may obviate further litigation. I will hear counsel as to the form of the decree and whether it would be proper to reserve leave to apply for further directions, in case the retirement of the stock be not found feasible.