924

**WOODSON et al. v. McALLISTER et al.**
No. 9813.

Circuit Court of Appeals, Fifth Circuit.
May 19, 1941.

Rehearing Denied June 30, 1941.
See 121 F.2d 126.

HUTCHESON, Circuit Judge, dissenting.

Chandler Lloyd and Dallas C. Biggers, both of Dallas, Tex., H. Grady Chandler, of Austin, Tex., and C. W. Trueheart, of San Antonio, Tex., for appellants.

W. L. Matthews and J. D. Wheeler, both of San Antonio, Tex., for appellees.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

HOLMES, Circuit Judge.

This suit was filed by appellant on behalf of herself and all other stockholders similarly situated. She seeks the cancellation of corporate stock of the par value of $400,000 issued to one of the appellees. She alleges that nothing was paid for the stock, either in money, labor, or property, and that the issuance thereof was void under the constitution and statutes of the State of Texas.

■ The provisions relied upon by her provide that no corporation shall issue stock except for money paid, labor done,

or property actually received and that all fictitious increase of stock shall be void. Art. 12, Sec. 6, Texas Constitution, Vernon's Ann.St.; Art. 1353, Revised Civil Statutes of Texas. Even the note of a solvent person, though property in a literal sense, is not property of a nature that may constitute the capital of a corporation. Under the Texas law, the term "means property readily capable of being applied to the debts of the corporation." Washer **v.** Smyer, 109 Tex. 398, 211 S.W. 985, 986, 4 A.L.R. 1320.[1]

The stock in controversy was issued to W. W. McAllister by the Southern Associated Companies, a Texas corporation, which holds all of the permanent stock of the San Antonio Building & Loan Association, also a Texas corporation. Both companies had the same officers and directors; McAllister was and is president of each. It is admitted that no money was paid for the stock, or labor performed; but it is contended that McAllister transferred to the Southern Associated Companies either permanent stock of said association of the value of $750,000 or an option to buy, for $300,000, all of said permanent stock, which option, it is contended, was property of the value of $400,000 and was a sufficient consideration for the issuance of the stock under the constitutional and statutory provisions above mentioned.

Although the permanent stock was issued in the depression month of September, 1931, it is claimed that the record of earnings of this association in 1930 and prior years gave this option an exceptional value. McAllister had been its president and manager for some years. He had a managerial contract with it which gave him all of the earnings of the association after making provision for certain expenses, dividends, and reserves. In June, 1929, he agreed to buy and later bought his partner's one-half interest in this contract for $150,000. The directors testified that they considered the option worth at least $400,000. They based their valuation upon prior earnings of the association, and seem to have disregarded entirely the business collapse of 1929 and the general depression which followed. McAllister testified that people were saying prosperity was just around the corner, and that he believed it. Not only did the rose-colored view which he and the directors took of the future prove to be entirely wrong, but the facts in the record show that, at the time of this transaction, the option had only a speculative value, and that the permanent stock was not worth more than par. The option had no real or market value. The manager's contract, which had proven so profitable during the fat years preceding 1931, would have afforded McAllister no such remuneration during the lean years to follow.

Months before this transaction, the association had begun to reduce its dividends to shareholders. Early in 1931, the rate was reduced from ten to eight per cent; later, from eight to seven per cent; and then, on December 31, 1931, it was reduced from seven to three per cent. There was a definite decline in business conditions beginning in July, 1931, so McAllister testified. On July 15, 1931, the association owed $250,000 to various banks for money borrowed, and had approximately 530 delinquent loans, which was more than usual. In August, 1931, the directors were discussing the putting of a limitation upon withdrawals; and at the directors meeting of September 16, 1931, a resolution was passed actually limiting withdrawals by shareholders to fifty per cent of the monthly receipts of the association. This was thirteen days after Southern Association was organized, and only thirteen days before the City Central Bank in San Antonio failed.[2] Beginning with January,

---

[1] See also Chisolm Bros. v. Forny, 65 Iowa 333, 21 N.W. 664; See v. Heppenheimer, 69 N.J.Eq. 36, 61 A. 843; State Trust Co. v. Turner, 111 Iowa 664, 82 N.W. 1029, 53 L.R.A. 136; O'Bear-Nester Glass Co. v. Anti-Explo Company, 101 Tex. 431, 108 S.W. 967, 109 S.W. 931, 16 L.R.A.,N.S., 520, 130 Am.St.Rep. 865; McCarthy v. Texas Loan & Guaranty Co., Tex.Civ.App., 142 S.W. 96; Thompson v. First State Bank of Amarillo, 109 Tex. 419, 211 S.W. 977; Kanaman v. Gahagan, 111 Tex. 170, 230 S.W. 141; Van Cleve v. Berkey, 143 Mo. 109, 44 S.W. 743, 42 L.R.A. 593.

[2] As to conditions at that time, McAllister himself testified as follows:

"A. I think that the first week after the failure of the City Central we had a thousand people come in and ask for a million and a half dollars, and of course if we were going to keep our money working so as to pay them dividends we had no means with which to pay any such requests, and as the year went on conditions became worse and worse and we received between October 1st and the end of the year additional requests for withdrawals to such an extent that we declined to accept any investment money. We wouldn't

1931, the effect of the depression not only was decreasing the association's collections on loans and stocks, but was increasing its applications for withdrawals and its delinquencies on interest payments.

Even if the option was property in the hands of McAllister, the San Antonio Building & Loan Association legally could not have received it for its permanent stock or for any part thereof. The constitution and laws of Texas are not so easily evaded as to permit the officers and directors to do indirectly what they may not do directly; and yet nothing is clearer than that one of the immediate purposes of organizing Southern Associated was to carry out the scheme of enabling McAllister to receive stock for his contract, his option, or his good will, whichever you choose to call it. The entry, as first put on the books of the Associated Companies, recited that $400,000 of stock had been issued to W. W. McAllister "to record the purchase of good will of the San Antonio Building & Loan Association from W. W. McAllister."

This stock was also carried as good will on a balance sheet which McAllister says he looked over for some three years and never corrected. On the balance sheet for the year ending December 31, 1935, we find a change. Instead of being carried as good will, this $400,000 item was carried as "intangible asset, purchase price, building & loan manager's contract." The resolution at the first stockholders meeting authorized issuance of the stock to McAllister "in consideration of the surrender of his operating contract with the San Antonio Building & Loan Association" and the transfer of his option to purchase the entire issue of permanent stock.

The surrender of the manager's operating contract was not a consideration moving to Southern Associated. That consideration went to San Antonio Building & Loan Association for the option. Yet this contract must have been not entirely surrendered, because it continued to receive membership fees until January 1, 1938, according to the testimony of McAllister himself. Conceding it was wholly surrendered to San Antonio Building &

Loan Association, it could only be surrendered once; and could not thereafter have been surrendered to Southern Associated. This left only the option to serve as a consideration moving to Southern Associated for the issuance of its stock to McAllister.

It is contended that the directors valued the 3000 shares of permanent stock at $750,000, and McAllister's good will or option at $400,000. These valuations are too fanciful and speculative to constitute the capital of a Texas corporation. At the first meeting of the stockholders, held September 9, 1931, none of the so-called directors had any stock in Southern Associated. The only stock they now have, or ever had, with one exception, was given to them by McAllister to qualify them as directors. So all stock owned by these directors, except one, came from an illegal source if the issuance of the stock to McAllister was illegal. No other meeting of the stockholders was held until May, 1935. What directors' meetings were held does not appear in the record. The directors were so inconspicuous in the mind of McAllister that he was not positive whether or not Roy Campbell, named in the charter as a director, ever was a director. Only two stockholders besides McAllister were present at the first stockholders meeting. The others were represented by proxies. McAllister had no stock of his own at the time. These directors and McAllister, so far as they were exercising business judgment or discretion in the matter, were trading not only for the corporation but for themselves, as the directors were to get part of the stock to be issued to McAllister.

One cannot have his cake and eat it too, but that is what the directors have sanctioned, and permitted to be done with the manager's contract, in this case. They desired to issue permanent stock which would derive its dividends solely from the excess earnings of the association; but the president, who drew no salary from the association, was entitled to all such earnings under his manager's contract. In consideration of his relinquishing claim to all such earnings, McAllister was given the option to buy the permanent stock, was

---

accept any new investment money after October 1st.

"Q. What has happened generally with reference to the home loan market and the business of loaning money for the construction of homes in Texas? A. It

just simply faded out, there just wasn't any loans being made and mortgage companies and insurance companies and building and loan associations were taking back properties, well, just like they had never taken them before."

placed on an annual salary of $25,000,[3] and was permitted to draw down something over $50,000 in cash from the special reserve fund. He could not sell the option to the association; he could not exchange it for permanent stock; so a holding company was organized. Stockholders in the association (with a limitation on withdrawals) were switched to the Southern Associated Companies, and enough cash was raised to buy the permanent stock of the San Antonio Building & Loan Association. Then $400,000 of Southern Associated stock was issued to McAllister for his good will, and the practical effect was that stockholders like appellant, who had bought as aforesaid, lost about half their investment unless the stock issued to McAllister without consideration is cancelled. At a time when regular shareholders were not permitted to withdraw their savings, the manager was allowed to draw out something over $50,000 in cash which was in the special reserve fund for the protection of those stockholders; and purchase from him of the furniture, fixtures, and equipment of the San Antonio Building & Loan Association at appraised value was authorized.

The facts in the record are undisputed. We do not have here a question merely of overvaluation of the permanent stock. McAllister did not purchase the permanent stock; he never owned it; he did not exchange it for Southern Associated stock at an agreed valuation. McAllister did not transfer to Southern Associated any good will of San Antonio Building & Loan Association. He paid no money of his own for the permanent stock. He gave nothing which may legally constitute the capital of a corporation to Southern Associated for the $400,000 of stock in controversy, and Southern Associated received nothing of such nature for it from any one else. He did not even transfer the option, as is now claimed. What he did was to fail to exercise the option for himself; he exercised it for and in the name of Southern Associated, and bought the stock for Southern Associated with the money and in the name of Southern Associated. It is clear enough now, and should have been clear at the time, that Southern Associated paid in cash full value for the 3000 shares of permanent stock it received from San Antonio Building & Loan Association.

■■ Neither the plea of laches nor of the statute of limitations is a defense in this case.[4] A stockholder has the right to presume that corporate officers and directors are not issuing stock in violation of the constitution and laws of the state. Neither the minutes of the corporation nor the records in the office of the Secretary of State would have revealed the illegality of this transfer unless the entry of good will would have done so. But stockholders are not required to examine the minutes or books of the corporation, or records in the office of the Secretary of State, to ascertain if officers and directors are complying with state laws. Moreover, appellant did not have free access to the books of Southern Associated, and she had trouble enough getting the facts when she began to investigate. It was necessary for her to file a petition for mandamus against McAllister and the Southern Associated Companies. To this petition, first, they filed a demurrer; second, appellees denied each and every allegation contained in the petition for mandamus, and demanded strict proof thereof; third, for further answer, they extended to appellant permission to examine the books, except the stockholders list which of course listed the McAllister stock. By agreement, the appellants finally obtained access to the books on March 25, 1940. This suit was filed July 15, 1940.

The application of W. W. McAllister to the Secretary of State for a permit under the blue-sky law recited that McAllister was to receive $400,000 in stock "for the cancellation of his contract and the delivery of the permanent stock in the San Antonio Building & Loan Association to the holding company." It further recited the following with reference to the capital stock of Southern Associated Companies: "All of the capital stock will be paid for in cash, except the stock going to Mr. McAllister, which will be paid for by the cancelling of said contract and the delivery of said permanent stock." This was at least ambiguous and misleading as to the consideration to be paid by McAllister for his stock.

---

[3] In a short time, the situation got so bad that the president voluntarily reduced his salary to $12,000 per annum.

[4] Joy v. Fort Worth Compress Co., 24 Tex.Civ.App. 94, 58 S.W. 173; Costley v. Gracy, Tex.Civ.App., 52 S.W.2d 920;

Glenn v. Steele, Tex.Sup., 61 S.W.2d 810; Tooker v. National Sugar Refining Co., 80 N.J.Eq. 305, 84 A. 10; Pomeroy's Equity Jurisprudence, 4th Edition, Vol. 2, Sec. 917; 27 Texas Jurisprudence, p. 30.

■ The stock in controversy should be cancelled, and the dividends paid thereon refunded. This will be adequate relief upon the record before us. No innocent purchasers are parties hereto, and it does not appear that any of the stock has passed beyond the control of McAllister. Relief by cancellation, of course, precludes any recovery of damages against McAllister for failure to pay his stock subscription, and such relief is denied. No question of attorney's fees was settled by the court below, and that matter is left for the determination of the district court in the first instance.

The judgment appealed from is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

HUTCHESON, Circuit Judge (dissenting).

While I share the opinion of the majority, that what McAllister gave for the stock was not "reasonably worth at least the sum at which it was taken by the company",[1] that in short, the stock issued to McAllister was quite disproportionate to any value received from him for it, I cannot agree that the shares were void in his hands as a fictitious increase of stock under Article 12, Section 6, Texas Constitution. Texas authorities are quite plain that the two provisions of the constitution, (1) that no corporation shall issue stock or bonds except for money paid, labor done or property actually received, and (2) all fictitious increase of stock shall be void, are quite separate and distinct and that it is only when there is a "fictitious increase" that the shares are void. Smith v. Ideal Laundry Company, Tex.Civ.App., 286 S. W. 285; approved in McAlister v. Eclipse Oil Co., 128 Tex. 449, 98 S.W.2d 171. Neither can I agree with the apparent though not clearly disclosed view of the majority that the transaction was affected with fraud and concealment, and neither limitations nor laches is a defense to the

suit. Improvident as the valuation placed on McAllister's contract was, resting so largely as it did, on faith in the future, the substance of things hoped for, the evidence of things unseen, there was neither fraud nor concealment about it.[2]

Everything was done in the open, the whole matter was disclosed and was open and available to the state authorities, including the Secretary of State, McAlister v. Eclipse Oil Co., supra, and to all of those to whom stock was sold.

While therefore, because of the great disproportion between the value placed on McAllister's surrendered right to continue to take the profits under his contract with the Building and Loan Association, and the amount of stock issued to him, relief from the excessive overvaluation could and should have been granted, if the suit had been timely brought, at the instance of persons who could show their non-assent to the transaction, Cf. Smith v. Ideal Laundry Company, McAlister v. Eclipse Oil Co., supra; Park v. Compton, 5 Cir., 55 F.2d 80, long acquiescence and the statute of limitations have barred the action.

It is settled in Texas that a suit of this kind must be brought within four years after the cause of action has accrued. Brought by one stockholder, none of the others joining in the suit, after an acquiescence of nine years, all of the others continuing to acquiesce therein, the long delay and acquiescence and the statute of four years limitations have long since barred the action and the judgment should be affirmed. Pruitt v. Westbrook, Tex.Civ. App., 11 S.W.2d 562; Pacific American Gasoline Company v. Miller, Tex.Civ.App., 76 S.W.2d 833; 27 Tex.Jur. page 24; Southwestern Portland Cement Company v. Latta & Happer, Tex.Civ.App., 193 S.W. 1115; Smith v. Ideal Laundry Co., supra; McCord v. Nabours, 101 Tex. 494, 109 S.W. 913, 111 S.W. 144.

I respectfully dissent from the reversal

---

[1] Vernon's Texas Civil Statute, Art. 1353—Watering stock—"No corporation shall issue any stock whatever, except for money paid, labor done which is reasonably worth at least the sum at which it was taken by the corporation, or property actually received reasonably worth at least the sum at which it was taken by the company."

[2] But if there was, the authorities cited in the majority opinion establish that

in Texas, fraud prevents the running of a statute of limitations only until discovered or until by reasonable diligence the fraud might have been discovered, "knowledge of facts that would cause a reasonably prudent person to make inquiry which would lead to discovery of the fraud is in law a knowledge of the fraud. Tex.Jur. vol. 20, p. 112, § 75, and authorities there cited." Glenn v. Steele, Tex.Sup., 61 S.W.2d 810; 27 Tex.Jur. page 30.