[S. F. No. 9055. In Bank.—July 22, 1921.]

# W. F. BOARDMAN COMPANY (a Corporation), Appellant, v. THOMAS D. PETCH, Respondent.

[1] CORPORATIONS—OWNERSHIP OF PROPERTY—STOCKHOLDERS.—A corporation is the creature of its stockholders and they, as between themselves and the corporation, are the beneficial owners of the property held by the corporation.

[2] SALE—MEANING OF TERM.—The word "sale" when used in a contract does not necessarily mean a transfer for money only, since it is not a word of fixed and invariable meaning and may be given a narrow or broad meaning as may be indicated by the context or the surrounding circumstances and the conduct of the parties.

[3] EMPLOYER AND EMPLOYEE—BREACH OF CONTRACT OF EMPLOYMENT—MEASURE OF DAMAGES OF EMPLOYEE.—In an action by an employee for breach of a written contract of employment instituted before the expiration of the contract period, the measure of damages is the amount of the salary agreed upon for the entire period of service, less the amount which the employee has earned or with reasonable effort might have earned from other employment.

[4] ID.—ACTION AFTER EXPIRATION OF PERIOD OF EMPLOYMENT—INTEREST.—In an action by an employee for breach of a written contract of employment at a monthly or fixed salary, instituted by the employee after the termination of the contract period of service, interest is allowable upon the amount found due the plaintiff, in view of the provisions of section 3287 of the Civil Code.

[5] ID.—COMPENSATION OF EMPLOYEE — SALARY AND PERCENTAGE OF PROFITS—DETERMINATION OF PROFITS—EVIDENCE—VALUE OF SERVICES OF EMPLOYER TO TRANSFEREE.—In an action by the manager of a gas company for breach of his contract of employment by the terms of which he was to receive a percentage of profits in addition to salary, it was error prejudicial to defendant to exclude evidence of the value of the services rendered by the company to a new corporation to which it made a transfer of all its property for bonds, where it was a part of the arrangement that the company should take charge of and superintend the operations of the new corporation and such services were performed.

[6] ID.—CONDUCT IN MANAGEMENT OF PROPERTY—RIGHT OF EMPLOYER. In such an action, the defendant should be allowed to prove the plaintiff's conduct in managing the property, during the time that he served in such capacity, in so far as it indicates his want of capacity or neglect of duty.

[7] ID.—PROFITABLE GAS-MAIN—NECESSARY NUMBER OF CONSUMERS.—In such an action, the exclusion of the opinion of a witness who

had had long experience in operating and financing gas plants, as to the number of consumers necessary to make a given length of gas-main profitable, was prejudicial error, where such fact had a direct bearing on the question of good cause for discharge.

[8] ID.—VIOLATION OF INSTRUCTIONS—JUSTIFICATION—ERRONEOUS IN-STRUCTION.—In such an action, an instruction that if the plaintiff violated material and proper and reasonable instructions from the defendant in regard to the performance of his duties, the plaintiff could not justify such a violation on the ground that he believed he was acting for the best interests of the defendant, was erroneous in leaving the question to the jury whether the instructions violated were material, proper, and reasonable.

[9] ID.—PROCURING OF EMPLOYMENT — DUTY OF WRONGFULLY DIS-CHARGED EMPLOYEE — AMBIGUOUS INSTRUCTION. — An instruction that while a wrongfully discharged employee is bound to use reasonable diligence to procure employment, he is not bound to accept any sort that may be offered to him, is ambiguous and likely to be misleading.

[10] ID.—CONSTRUCTION OF GAS PLANTS — COMPLIANCE WITH TOWN ORDINANCES—FAILURE TO USE CARE AS GROUND FOR DISCHARGE—INACCURATE INSTRUCTION.—An instruction that the manager of a gas company was required to use reasonable care to comply with the ordinances of the towns in which the gas plants were being constructed, and that any failure on his part to use reasonable care would be a sufficient ground of discharge, is not entirely accurate, since it is only when such a failure is negligent or willful that a sufficient ground exists.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. John Hunt, Judge. Reversed.

The facts are stated in the opinion of the court.

Chickering & Gregory for Appellant.

Frank McGowan and Elmer Westlake for Respondent.

SHAW, J.—This is an appeal by the plaintiff from a judgment rendered upon a second trial of the case, following a reversal of the judgment entered on the first trial upon appeal to this court. (*Boardman* v. *Petch,* 174 Cal. 259, [162 Pac. 1028].)

A statement of the facts is necessary to a clear understanding of the points to be considered. On January 28, 1911, plaintiff and defendant entered into a contract which

forms the basis of the controversy. The plaintiff was then the owner of practically all the stock in a corporation known as the Rogue River Valley Gas Company, having a plant situated at Medford, Oregon, for the supplying of gas and electricity for public use. By the terms of the contract Petch was employed "to devote his time, attention, and ability to the management of the property mentioned, by using every effort in his power to make it successful." He was to be employed for five years at three thousand dollars per year, in monthly payments. The agreement provided that in addition to said salary Petch was to be paid by the plaintiff six per cent of the net profits received by the plaintiff on the sale of the Rogue River Valley Gas Company, should the sale be made on or before five years from the date of the contract. If the property was not sold within the five years it was to be appraised by a committee of three persons. They were to take the actual cost up to the time of appraisement, with interest at six per cent from the time money was furnished to that date, deduct this from the appraised value, and the balance was to be deemed actual profits upon which Petch was to receive six per cent to be paid by the plaintiff. In this behalf the contract stated: "The first parties [plaintiff] then agree to deliver to the said second party [Petch], or his heirs at time of said sale, this six per cent in cash, or if the property has not been sold, in stock or bonds." By a transaction between plaintiff, Rogue River Valley Gas Company, and Oregon Gas & Electric Company, which was closed on June 3, 1911, all the property belonging to the Rogue River Valley Gas Company passed into the possession of the Oregon Gas & Electric Company. Whether this transfer constituted a sale, within the meaning of the contract aforesaid, is one of the principal questions in the case. Petch continued thereafter to manage the property included in the transfer, as before, until March 23, 1912, when he was discharged from further service. This action was begun on March 12, 1912, by the plaintiff by a complaint asking for the reformation of the aforesaid agreement in certain particulars not important here. On August 15, 1912, the defendant filed a cross-complaint thereto. Upon the first trial of the case the court entered a judgment of nonsuit against the plaintiff upon its complaint and thereafter proceeded to trial upon the cross-complaint. From this judgment no ap-

peal was taken and the complaint ceased to be a part of the pleadings in the action for any practical purpose thereafter. From the judgment entered upon the cross-complaint the plaintiff appealed and upon that appeal that judgment was reversed and the cause remanded for a new trial.

Upon the appeal in that case it was conceded that there had been a sale of the property of the gas company which became effective on June 3, 1911, and the question whether or not the transaction above referred to constituted a sale was not discussed or determined. It was determined upon that appeal: (1) That under the contract Petch was to be employed for five full years at three thousand dollars a year whether there was a sale of the property of the Rogue River Valley Gas Company during that period or not; (2) that under the evidence there presented, where it appeared that the plaintiff had continued in control of the plant after the transaction of June 3, 1911, Petch was bound to continue his services as manager for the remainder of the five years after such transaction, if the plaintiff desired him to do so; (3) that in addition to this salary for five years he was to receive six per cent of the net profits of a sale, if made w'thin the five years.

After the reversal upon the former appeal defendant filed an amended cross-complaint, wherein he alleged: (1) A cause of action to recover the sum of $11,750 and interest, on account of unpaid salary on the five-year contract of employment aforesaid, based on the allegation that he was discharged from said employment without cause on March 23, 1912, being the salary due monthly from March 1, 1912, to February 15, 1916; (2) a cause of action for twenty-three thousand seven hundred dollars, claimed as six per cent of the net profits of a sale of the Rogue River Valley Gas Company's property alleged to have been made by the plaintiff in 1911 as aforesaid; (3) a cause of action for special damages in the sum of $425, arising from the alleged wrongful discharge. In its answer thereto the plaintiff put in issue all of the essential allegations of the cross-complaint. This cross-complaint and answer presented the only issues to be determined upon the second trial.

These issues were tried by a jury and a verdict was rendered in favor of the defendant, on his cross-complaint, for

$8,175. From the judgment rendered on this verdict the plaintiff appeals.

It is conceded in the argument that no evidence was introduced to support the allegation regarding the special damage of $425. The points of controversy arise solely with reference to the first and second causes of action above mentioned.

The plaintiff claims that the verdict for the sum of $8,175 is not supported by the evidence under either the first or second cause of action above mentioned. We will first consider the second cause of action, that for the recovery of six per cent on the net profits of the alleged sale of the property.

The evidence on this subject is without substantial contradiction. The Boardman Company was the owner of the entire issue of stock of the Rogue River Valley Gas Company, even including that held by directors to qualify them to act. It controlled all its actions and it had furnished all the money used in the construction of the plant of that company, amounting to $112,605.74. (In making the deal under consideration the amount furnished was estimated at one hundred and twenty-five thousand dollars. It was afterward discovered that an item of over twelve thousand dollars had been entered twice upon the books as a charge against the company. The true amount was found to be as above stated and the matter was adjusted by returning stock and bonds to the Oregon Gas & Electric Company, the successor in interest of the Rogue River Valley Gas Company, to make up the amount of the mistake.) While carrying on the gas company's operations the Boardman Company concluded to enlarge the enterprise and construct other plants at other places to carry on the same kind of business. In order to do this it was necessary to obtain more capital. For that purpose it organized the Oregon Gas & Electric Company with a capital stock of one million dollars. To this company it immediately transferred all of its stock in the aforesaid gas company. Thereafter, until the transaction of June 3, 1911, was closed, the Boardman Company controlled the acts of both companies in carrying out that transaction. Two persons were found who agreed to invest one hundred and fifty thousand dollars in the electric company by the purchase of bonds and stock thereof at a valuation of ninety cents on the dollar of the face value of the bonds. The Boardman Com-

pany then caused the gas company to transfer its entire property to the newly formed electric company, in consideration of the issuance by the electric company to the Boardman Company of bonds of the electric company for one hundred and ninety-five thousand dollars, taken at a value of ninety cents on the face value, that is, at the value of one hundred and seventy-five thousand dollars, and stock of said company to the amount of $293,250, or thereabouts, par value, as a bonus. When this was done, it will be seen, the Boardman Company had merely caused the gas company to transfer its property to the electric company and in consideration had received all the issued stock of the electric company, together with the bonds aforesaid. It therefore controlled the action of the electric company as completely as it had previously controlled that of the gas company. The value at which the bonds were taken, if the equivalent of cash, constituted an increase of fifty thousand dollars over the estimated value of the investment in the gas company. When the subsequent adjustment was made the amount of bonds taken was reduced correspondingly, so that the excess of the value, measured in bonds, remained fifty thousand dollars as contemplated by the parties. The two new investors then paid in their one hundred and fifty thousand dollars in cash and received one hundred and sixty-six thousand dollars in bonds and two hundred and fifty thousand dollars in stock of the electric company, both at par value. Thereafter the Boardman Company was the owner of the majority of the stock of the electric company and controlled its actions, as before it had controlled those of the gas company.

[1] A corporation is the creature of its stockholders and it holds its property in trust for them. As between themselves and the corporation the stockholders are the beneficial owners of the property held by the corporation. (*Havemeyer* v. *Superior Court*, 84 Cal. 362, [18 Am. St. Rep. 192, 10 L. R. A. 627, 24 Pac. 121]; *Ashton* v. *Dashaway Assn.*, 84 Cal. 65, [7 L. R. A. 809, 22 Pac. 660, 23 Pac. 1091]; *Hobbs* v. *Tom Reed etc. Co.*, 164 Cal. 499, 501, [43 L. R. A. (N. S.) 1112, 129 Pac. 781]; *Rossi* v. *Caire*, 174 Cal. 81, [161 Pac. 1161].) Prior to the issuance of the stock of the electric company to the new investors, the only substantial change that had occurred, aside from the additional fifty

186 Cal.—31

thousand dollars to the Boardman Company, was a change of trustee of the property, the electric company having succeeded the gas company in that capacity. The change in the form of the indebtedness from an open account to bonds would not of itself have had the effect to characterize the deal as a sale of the property and the transaction might have been considered a change of form only. But the debt was increased in the deal by the issuance to the Boardman Company of additional bonds of the electric company to the value of fifty thousand dollars at the discount price at which the bond issue was taken by all the parties. This was not added, so far as the evidence shows, on the ground that the services of Boardman Company in carrying on the business of the gas company were of that value. Nothing was said about such services and the increase was not made as for services chargeable to the gas company, but, on the contrary, it was added as the profit going to the Boardman Company by reason of the transfer and was designated as such. During the remainder of the year 1911 there were negotiations between the Boardman Company and Petch looking to a settlement of Petch's claim to the six per cent of the profits, and in the course thereof statements were made by the company to Petch wherein the transaction was set down as a sale and the profits thereon as claimed by the Boardman Company were stated.

[2] The code defines a sale as "a contract by which, for a pecuniary consideration, called a price, one transfers to another an interest in property." (Civ. Code, sec. 1721.) It is also defined as "a transmutation of property from one man to another in consideration of some price or recompense in value." (Anderson's Law Dictionary, 914; Mechem on Sales, sec. 1.) The agreement whereby one person transfers a right of way for a ditch over his land in consideration that the other party should excavate the ditch and keep it in repair for the common use of both was held to be a sale of the right of way. (*Flickinger* v. *Shaw*, 87 Cal. 130, [22 Am. St. Rep. 234, 11 L. R. A. 134, 25 Pac. 268].) It is clear, therefore, that the word "sale," when used in a contract, does not necessarily mean a transfer for money only. It is not a word of fixed and invariable meaning. (*Eaton* v. *Richeri*, 83 Cal. 186, [23 Pac. 286].) It may be given a narrow or broad meaning as may be indicated by the con-

text or the surrounding circumstances and the conduct of the parties. "The contemporaneous and practical construction of a contract by the parties is strong evidence of its meaning, if its terms are equivocal." (*Keith* v. *Electrical etc. Co.*, 136 Cal. 181, [68 Pac. 598]; *Kennedy* v. *Lee*, 147 Cal. 596, [82 Pac. 257]; *Vulcan Iron Works* v. *Cook*, 15 Cal. App. 412, [114 Pac. 995].)

The effect of the agreement between the parties was that Petch was to receive six per cent of the profits of the Boardman Company's investment in the Rogue River Valley Gas Company in any event. If a sale was made within the five years the profit was to be ascertained from the price obtained on the sale. If there was no sale, then it was to be ascertained by an appraisement in accordance with the agreement whereby the cost was to be deducted from the appraised value and the balance taken as the profits.

In view of all this evidence and from these authorities we are of the opinion that the evidence was sufficient to justify a conclusion by the jury that there was a sale of the property within the meaning of that term as used in the agreement and that they might have believed from the evidence that there was a profit of at least fifty thousand dollars received by the Boardman Company upon that sale. It is true that no money was obtained, but the bonds taken upon the transaction were valued therein at ninety cents on the dollar, and the jury would have been justified in concluding that at that time the bonds had that value in cash. On that issue, therefore, the jury might have decided that Petch was entitled to three thousand dollars as his percentage of the profits on the sale, with interest from June 3, 1911.

[3] Under the rule established by the former decision, Petch was entitled to employment for five years at three thousand dollars a year, payable monthly, regardless of the fact that a sale took place in June, 1911. He could not be deprived of this right except by conduct which justified his discharge for cause. The appellant does not claim that there is not sufficient evidence to uphold the finding of the jury that the discharge was without cause. It appears that for the remainder of the five years after his discharge $11,875 would become due upon the salary, not including interest, and that during that time he earned by other employments $4,550, leaving a balance of $7,325 unpaid upon the amount which

the Boardman Company agreed to pay him. The measure of damages in such cases is the amount of the salary agreed upon for the entire period of service, less the amount which the servant has earned or with reasonable effort might have earned from other employment. (3 Elliott on Cont., secs. 2154, 2155; *Seymour* v. *Oelrichs,* 156 Cal. 801, [134 Am. St. Rep. 154, 106 Pac. 88].) In *Seymour* v. *Oelrichs* the suit was begun and the judgment rendered long before the termination of the employment, and while it was said that the measure of damages was the amount due on the contract, less the amount earned, there was no occasion for considering the proposition of interest. Prior to the termination of the employment, of course, it could not be ascertained how much the employee would have earned during the unexpired portion of the time, and the damages would be unliquidated in the sense in which that term is used in the cases holding that interest is not allowable as damages for a discharge without cause. [4] It does not follow, however, that this is the rule where the time had expired and the inquiry is made when the facts can all be ascertained. "The law is well settled, that where a contract for service is made for a fixed period, if the employer discharge the servant before its termination, without good cause, he is still liable, and the servant may recover the stipulated wages." (*Webster* v. *Wade,* 19 Cal. 292, [79 Am. Dec. 218].) Where one was employed for a year to perform certain duties and was at all times ready and willing to perform them, but was prevented from doing so by the employer and could not obtain other employment, his damage is the amount he would have received under the contract if he had performed the duties thereof. (*Hancock* v. *Board of Education,* 140 Cal. 554, 562, [74 Pac. 44].) We think the provisions of section 3287 of the Civil Code authorize the allowance of interest in cases like the present one where the damages are not estimated until after the term of employment has expired. That section provides: "Every person who is entitled to recover damages, certain, or capable of being made certain by calculation, and a right to the recovery of which is vested in him upon a particular day, is also entitled to recover interest thereon from that day, except during such time as the debtor is prevented by law or by the act of the creditor from paying the debt." Under the terms of the contract Petch was entitled to $250 at the

end of each month. This obligation became absolute at that time and the failure to pay each monthly installment was a breach of the contract. The amount was absolutely certain except as reduced by the earnings of Petch in other employment. If the month had not yet expired when the discharge took place the amount of such earnings would be uncertain, but after the expiration of the period—and in this case after the expiration of the entire period of the contract—the amount of his earnings from other sources was capable of ascertainment by calculation from the evidence on the subject of his earnings and it comes within the terms of section 3287, upon which interest would be allowed on the respective amounts. The question of the right to recover interest was not raised upon the former appeal and there is nothing in the opinion then rendered that is decisive of that question. The evidence shows without dispute that for the first three months after his discharge he had no employment. Three monthly payments would become due during that period and each would draw interest. Also from February 1, 1913, to March 1, 1914, he was without employment and $3,250 became owing for the monthly payments. In short, a mere calculation will show that the amount of the unpaid balance of his five-year contract, with interest from the time the payments became due, would more than equal the amount of the verdict. There is no claim that he was lacking in diligence in endeavoring to get other employment. It follows that we cannot say that the evidence is insufficient to support a verdict for the amount given.

The evidence sustaining the verdict is, however, rather unsatisfactory, and errors of law were made at the trial which we feel must have been prejudicial to the plaintiff, and we proceed to consider them.

[5] There was evidence to the effect that a part of the arrangement for the transfer from the gas company to the electric company was that the Boardman Company should take charge of, oversee, and superintend the operations of the electric company for a period of five years thereafter and superintend the construction of the new plants to be erected at Grants Pass and Roseburg, all without any charge therefor to the electric company, and that it had performed that part of the agreement up to the time of trial.

The plaintiff then offered evidence to prove the value of such services and the court refused to admit the evidence. This ruling was erroneous. The fact that the Boardman Company held the majority of the stock of the electric company did not put upon it any obligation to perform these services. That service would have been the duty of the managing officers of the company and for performing it they would have been entitled to compensation from the company, which would have come out of all stockholders alike. If this agreement was, as the testimony indicated, a part of the consideration for the transfer, then the value of the services was an additional contribution of the Boardman Company and should have been deducted from the price paid to it in order to determine the profits made by it in the transaction. The evidence should have been admitted.

[6] Upon the question whether or not Petch was discharged without cause there was a sharp conflict in the evidence. The plaintiff should have been allowed to prove his conduct in managing the property during the time he served in that capacity, in so far as it indicated his want of capacity or neglect of duty. It should, therefore, have been allowed to prove, if it could, that it was not necessary or proper for Petch to lay a pipe-line three thousand feet long across the property of another, and to buy and install a gasoline engine and pump in a well at the end of such pipe, to supply water to the gasworks, when an equally good supply could have been obtained much nearer to the works. The form of the question put to the witness to elicit this information was faulty, and if the objection had been to the form alone it should have been sustained. The facts showing the impropriety or lack of necessity should have been shown instead of showing it by the opinion of the witness. But the objection was that the evidence was irrelevant and immaterial, not that the question was defective in form, and the ruling had the effect of excluding the evidence entirely.

[7] The witness Boardman should have been allowed to give his opinion as to the number of consumers that were necessary to make a given length of gas-main profitable. He had had long experience in operating and financing gas plants in several places and was qualified to testify on the subject. It was not necessary that he should have had a technical education as an engineer or experience as a

plumber.  The evidence had a direct bearing on the question whether or not the Boardman Company had good reason to discharge the defendant from its service, and its exclusion was necessarily prejudicial to the plaintiff.

[8]  The court instructed the jury that "if the defendant violated material and proper and reasonable instructions" from the plaintiff in regard to the performance of his duties, the defendant could not justify a violation of such instructions on the ground that he believed he was acting for the best interests of the plaintiff.  The instruction was erroneous in leaving the question to the jury whether the instructions violated were material, proper and reasonable.  Either the court should itself have determined that they were reasonable or should have stated the facts hypothetically so that the jury might know what was considered reasonable in point of law.

[9]  The instructions that "while a wrongfully discharged employee is bound to use reasonable diligence to procure employment, he is not bound to accept any sort of employment that may be offered him," is ambiguous and likely to be misleading.  It should not have been given in the form above stated, but should have been made more certain and definite.

[10]  The plaintiff asked an instruction that Petch, as manager, was required to use reasonable care to comply with the ordinances of the towns in which the gas plants were being constructed, and that any failure on the part of the defendant to use reasonable care would be sufficient ground for discharging him.  The court gave the first part of the instruction, but modified it by striking out the last part to the effect that failure to use such care would be reasonable ground for discharge.  The instruction as asked is not entirely accurate.  It is not true in all cases that a failure to use reasonable care would be sufficient ground for discharge. The failure might be excusable.  If the failure were negligent or willful, then it would be sufficient ground for a discharge.

On account of the rulings above mentioned we find it necessary to reverse the judgment.

The judgment is reversed.

Wilbur, J., Lennon, J., Sloane, J., Lawlor, J., and Angellotti, C. J., concurred.