[Civ. No. 21213. Second Dist., Div. Two. May 24, 1956.]

HERBERT D. THOMAS, Respondent, v. BUTTRESS & McCLELLAN, INC. (a Corporation) et al., Appellants.

Guy E. Ward and Clarke A. Knicely for Appellants.

Zahradka, Glines & Bentley for Respondent.

ASHBURN, J.—Plaintiff brought an action for the recovery of commissions under an oral contract of employment. The jury returned a verdict in plaintiff's favor against defendants Buttress & McClellan, Inc., Panelcrete of California, and J. E. McClellan in the sum of $44,723.90. Defendants appeal from the judgment.

The employment agreement, which was made in June, 1950, specified that plaintiff should become sales manager for defendant Buttress & McClellan and as compensation receive a salary of $700 per month, plus a commission of one-fourth of 1 per cent of "gross sales" of the employer.

Of the numerous claims made by appellants as ground for reversal it is necessary to consider only one primary and one secondary contention: (1) That the basis for computation of commissions due plaintiff as such sales manager cannot include the cost of a certain construction job done for Consolidated Vultee Aircraft Corporation (commonly known as Convair), a guided missile plant at Pomona, California; (2) alternatively, that the compensation received by Buttress & McClellan for doing that work is the maximum amount that can be included in the base if plaintiff is entitled to any commission on account of the Convair contract.

At the time the employment contract was made, Buttress & McClellan was engaged in selling "package" or "turnkey" construction jobs, mostly precast industrial plants. Plaintiff was familiar with defendants' business and its method of conducting the same. Asked to explain his duties as sales manager plaintiff testified: "A broad definition is the general supervision of the sales effort in obtaining business. To detail that, this was a peculiar situation. Buttress & McClellan occupied a very unique situation in the construction industry at that time. They were the pioneer developers of precast construction. That is what is commonly known as tillup. Buttress & McClellan did not participate in competitive bidders in the sense that an ordinary contractor would. They did not function on any jobs unless they made the drawings and did the construction as a package deal. In other words, the common terminology is a turn-key job, and in order to participate in the industrial picture in Los Angeles it was necessary for a certain amount of promotion in order to con-

vince a client that he would have the best economic picture by entering into a contract with Buttress & McClellan rather than hiring an independent architect and then submitting it to the general construction fraternity for competitive bids. That involved the constant knowledge of the new industrial projects within the area that we chose to work in and the submission of certain data to these people to encourage them to talk to us about the business and for us to make certain preliminary drawings of what we expected to furnish them and a detailed estimate which was generally explained to the client, what we expected to put into a building for a given amount of money. After that procedure had been completed, why, we were usually in the position to talk contract to them, develop a contract and submit it to the owner, with this stipulation, that we would furnish the working drawings for the building and complete the building ready for occupancy for the owner. Certain exceptions that the owner may or may not have furnished certain of his own facilities, but generally speaking it was a turn-key job where he would occupy the facilities when we would have completed them."

 Such a "package" or "turnkey" job required defendant to furnish all engineering and architectural services, supply all labor and material and deliver a completed structure for an agreed price. The agreement with plaintiff was that he should have a salary of $700 a month, plus one-fourth of 1 per cent of defendant's "gross sales." These package jobs comprised the whole business of defendant at that time, and the word "sales" necessarily applied to them. Technically they did not constitute sales (see *United Iron Works* v. *Standard Brass Casting Co.*, 69 Cal.App. 384, 388 [231 P. 567]; 46 Am.Jur. § 12, p. 206; 77 C.J.S. § 2, pp. 584-585; 27 Cal.Jur. § 3, p. 199), but all parties tried the case upon the theory that they were sales. As thus used that word was actually the equivalent of "gross receipts."

In April, 1951, some nine or ten months after plaintiff's compensation contract was made, the Convair guided missile job became a possibility; a letter of intent was issued on July 20, 1951; that was authority for doing the first $250,000 of work. The contract which eventuated on January 15, 1952 (made effective as of July 20, 1951) was quite different from the package deal that defendant was wont to make. It was a contract for the rendition of services and in no sense a sale. Defendant's compensation was to be a percentage of the actual cost of the work—under a "cost-plus-fixed-fee" contract—

which cost was borne by the United States. A joint bank account was established by Convair and defendant, the funds therein deposited were furnished by the government, and costs of labor and materials were paid out of that account upon the joint signatures of Convair and Buttress & McClellan. Title to materials or other purchases never vested in defendant and it received for itself none of the moneys of the joint account except its fee for supervision of the job. That fee was $435,219.90, based upon a cost of $17,113,703. (When the fee for architectural and engineering services is added the total cost becomes $18,234,244.63.) Clearly there was no sale here. ██ "A sale is a contract by which, for a pecuniary consideration, called a price, one transfers to another an interest in property. . . . 'Sale is a word of precise legal import. . . . It means at all times a contract between parties to give and to pass rights of property for money which the buyer pays or promises to pay the seller for the thing bought and sold.' " (*Van Allen* v. *Francis*, 123 Cal. 474, 479 [56 P. 339].) ██ "To constitute a sale of property as distinguished from other agreements or transfers relative to property it is essential that in addition to other elements the absolute or general property in the thing sold be transferred from the vendor to the vendee." (*Eggert* v. *Pacific States Sav. & Loan Co.*, 57 Cal.App.2d 239, 242 [136 P.2d 822].) The Convair deal was strictly a service contract (22 Cal.Jur. § 9, pp. 82-83; *Crowe* v. *Boyle*, 184 Cal. 117, 134 [193 P. 111]), and the problem is to determine whether the word "sale" as used in June, 1950, is to be held to apply to a deal made in 1951 or 1952 which does not possess the characteristics of a sale and which was not contemplated by the parties when dealing in June, 1950.

██ The intent of the parties to a contract is to be ascertained as of the time the contract was made, not some later date. (Civ. Code, § 1636; *Doll* v. *Maravilas*, 82 Cal.App.2d 943, 949 [187 P.2d 885]; 12 Cal.Jur.2d § 120, p. 328; 17 C.J.S. § 295, pp. 689, 694.) Subsequent unforeseen events cannot be allowed to control in arriving at that intent. In *Pendell* v. *Westland Life Ins. Co.*, 95 Cal.App.2d 766 [214 P.2d 392], the meaning of the word hernia as used in an insurance policy had to be determined. At page 777, the court said: "Contracts 'must be so interpreted as to give effect to the mutual intention of the parties *as it existed at the time of contracting.*' (Civ. Code, § 1636.) (Italics added.) The purpose of interpreting a writing is to ascer-

tain the intention of the parties at the time the writing was made. The action taken by appellant in 1946 with respect to the amount it would pay for specified 'hernia' operations has no bearing and does not shed any light on what was intended by the word 'hernia' as used by it in its 1943 contract." *Hoffer Oil Corp.* v. *Hughes*, (Tex.Civ.App.) 16 S.W.2d 901, 904: "In construing a contract, the cardinal rule is to ascertain the intention of the parties. Their intention is to be ascertained from the words used in the contract, construed in the light of the facts and circumstances surrounding the parties at the time it was made, and not in the light of subsequent unforeseen facts and circumstances, and in the light of the purposes sought to be accomplished by the making of the contract." *Nelson* v. *Big Rapids Gas Co.*, 299 Mich. 284 [300 N.W. 89, 95] : "To determine the intention of plaintiff and defendant it is necessary to examine their situation prior to and on May 20, 1933, when this contract was made. Changing circumstances and events subsequent to the execution of the contract are not controlling factors in determining such intention." (See also 17 C.J.S. p. 750, § 321.)

There is a conflict in the evidence concerning what happened at the time the Convair deal became a reality in July, 1951. Defendant McClellan asserts that he told plaintiff he would receive no commission on that job as payment of one would be illegal[1] and that plaintiff acquiesced. Plaintiff flatly denies any such conversation or understanding. He asserts that there was no change in the basis of his compensation either at that time or when he went to take charge of defendant's San Jose office in September, 1951. They jury having found with him, we must accept his testimony in this regard for present purposes. The record is devoid of any evidence pointing to a practical construction by the parties of the word "sale" as applied to a service contract such as the one with Convair. Plaintiff never made any claim to a commission upon that specific job and defendant never paid him on that basis, nor was there any talk or any agreement, express or implied, about it. We therefore have the bald question whether the word "sales" as used in June, 1950, applies to a deal made in July, 1951, or January, 1952, which has none of the earmarks of a sale.

---

[1] The record does not sustain this assertion of illegality of such a commission.

For present purposes it is as if there were no conflict in the evidence upon the subject, plaintiff's testimony having been accepted as true for purpose of this appeal. The question is one of law. So considered, it appears that there is no basis for applying the word "sale" to the entire cost (to the government) of the Convair job. As the original use of that word signified gross receipts of defendant, and there was no subsequent conversation on the subject, the fair interpretation of the language of the contract as applied to the new factual situation is that it continued to refer to gross receipts of defendant—in this instance the $435,000 fee.

The amount of the verdict shows that it was rendered upon the basis of an $18,000,000 sale and is therefore excessive; to what extent we are not in position to determine.

There seems to be no controlling equity which would justify a more expansive application of the term "sales." Plaintiff did not produce the customer or in any sense originate the Convair deal; he took no part in the negotiations; before he went to San Jose (from July to September) he took no part in the work, and that was also true after he went to the northern city. The only thing he ever did was to devote about three weeks to compiling some of the information that went into a brochure that was presented to Convair during the early discussions. The matter of commissions is not to be confused with that of salary. Plaintiff was paid $700 a month when in Los Angeles and a like amount when in San Jose. This is not a case of keeping an employee in service and denying an obligation to pay his salary. It is a question of measuring the additional compensation payable to him.

Appellants complain that the court wrongfully refused to instruct the jury upon the subject of what constitutes a sale, their theory being that the Convair job was not a sale and the $18,000,000 cost to the government not a proper basis for computing plaintiff's commissions. Proceeding upon the tacit assumption that gross sales are the equivalent of gross receipts, counsel for defendants requested instructions to the effect that the $435,000 fee is the measure of plaintiff's commission on the Convair job if he is entitled to any compensation thereon. Unfortunately, all such instructions requested by defendants were inept and properly denied for that reason.

But the record shows that this case went to the jury without their being advised of the real question to be solved by them. They were not told what constitutes a sale within

the purview of plaintiff's contract, or what was the basis of his compensation, or how it was to be computed. They were merely advised in two instructions that in the event they found plaintiff entitled to recover he should receive "one-quarter of one per cent of all the sales made by the defendants." The jurors were left to determine for themselves whether plaintiff was entitled to any compensation for the Convair job and were not told how to approach that question. This would be a serious defect in any trial.

■ It is generally recognized that the trial judge has a right to refuse an erroneous request without having any duty to modify it, and that he has a like right to ignore the absence of definitive or qualifying instructions. But that does not mean that the trial judge's obligation is limited to that of referee. Such authorities do not dispense with his obligation to see that justice is done and to that end to furnish the jurors with guidance upon the controlling legal principles applicable to the case. *Jaeger* v. *Chapman*, 95 Cal.App.2d 520, 525 [213 P.2d 404] : "Of course, although misleading, inaccurate or incomplete instructions need not be modified, it is incumbent on the trial court to give instructions on all vital issues in the case so that the jury will have a full and complete understanding of the law applicable to the facts, and if necessary to modify incomplete instructions or to give ones drafted by the court. (*Herbert* v. *Lankershim*, 9 Cal.2d 409, 482 [71 P.2d 220].)" The following language is quoted from the cited case of *Herbert* v. *Lankershim*: "In the interest of a full and complete understanding of the law applicable to the case it was necessary that the jury be instructed on the major subjects raised by the pleadings even if a modification in this or other respects was required to make a more acceptable presentation of the law. We think this is the rule approved by statute and judicial decision where fundamentals are involved, there being no attempt on the part of the author to mislead the court or jury by resorting to equivocally or ingeniously phrased requests, especially in cases where the jury otherwise would be left uninstructed on vital issues of the case." (P. 482.) *Pleasants* v. *Fant*, 22 Wall. (U.S.) 116, 121 [22 L.Ed. 780, 783] : "It is the duty of a court, in its relation to the jury, to protect parties from unjust verdicts arising from ignorance of the rules of law and of evidence, from impulse of passion or prejudice, or from any other violation of his lawful rights in the conduct of a trial. This is done by making plain to them the issues they are to try,

by admitting only such evidence as is proper in these issues, and rejecting all else; by instructing them in the rules of law by which that evidence is to be examined and applied, and finally, when necessary, by setting aside a verdict which is unsupported by evidence or contrary to law."

Volume 53, American Jurisprudence, section 510, page 412: "The law of every case, in whatever form presented, belongs to the court; and in a jury trial it is not only the prerogative of the judge, but his solemn duty, to declare it, especially where requested so to do. . . . In some jurisdictions the practice statutes and rules of practice impose an imperative duty upon the trial court to charge the jury. It is not to be inferred, however, that the trial court is bound upon its own initiative fully to charge the jury upon all facts and issues in this case; under this rule it is the duty of the trial court to instruct the jury on the basic fundamental rules applicable to the principal facts in issue, and if its charge does not fully cover the facts and issues as counsel conceive them, it is the latter's duty to request instructions upon specific questions arising." (See also 88 C.J.S. § 299, p. 811; 64 C.J. § 531, p. 592.)

The trial court on its own motion should have instructed the jury that the measure of recovery in the event they should adopt plaintiff's version of the facts would be one-fourth of one per cent of defendant's $435,000 fee, so far as the Convair job was concerned. The cause must be reversed. Of course there was a substantial conflict in the evidence upon this vital issue, for defendant McClellan testified in effect that he and plaintiff agreed that the latter should have no commission on the Convair job. Upon a new trial it would be the duty of the trial judge to give appropriate instructions upon the separate theories advanced by the respective parties.

Defendants moved for a new trial upon the grounds of excessive verdict, insufficiency of the evidence, that the judgment is against law, etc. The verdict being excessive as a matter of law the refusal to grant a new trial constitutes reversible error. (20 Cal.Jur. § 73, p. 115.)

The judgment is reversed.

Moore, P. J., concurred.

FOX, J.—I dissent.

In my opinion, the judgment against defendant Buttress & McClellan (hereinafter referred to as B&M), should be affirmed.

The record discloses that when plaintiff became B&M's sales manager, the company's main offices were in Los Angeles but its job sites were in various parts of the state. It maintained a branch office in San Jose, California, to handle its northern operations. Plaintiff's employment contract provided that in addition to a fixed salary, he was to receive .0025 per cent of "gross sales." He was paid this commission on the basis of the contract price regardless of whether he personally contributed to the consummation of a contract and regardless of whether a profit or loss was made on the project.

In the summer of 1951, B&M initiated work on the Convair project under a preliminary agreement dated July 20, 1951, known as the Letter of Intent. J. E. McClellan, who was president of B&M and was the person who engaged plaintiff, testified that he informed plaintiff that in the event B&M should get the Convair project, no commission on that project would be given him or any other salesman. He stated he told plaintiff he believed it would be illegal to award any commission on a government defense project, and that plaintiff expressed his assent. Plaintiff categorically denied that he was ever told no commission would be paid him on the Convair contract.[1]

As has been indicated, B&M was also engaged in construction activities near San Jose. In September, 1951, McClellan asked plaintiff to take charge of the B&M operation there to replace a man who had suffered a heart attack. Plaintiff assented reluctantly, and left to supervise B&M operations in that area. McClellan testified that a new compensation agreement was made at that time under which plaintiff was to receive a salary and 25 per cent of the profits of the northern business. Plaintiff testified that no alteration was made of the terms of his original agreement.

In November, 1951, McClellan organized a corporation named Panelcrete to take over B&M's San Jose operations. Panelcrete's main office was located at the Los Angeles address of B&M and it also occupied the former office of B&M in

---

[1]Of course, if such commissions were in fact illegal, this would be a complete defense to plaintiff's claim. It is significant that defendants did not interpose the defense of illegality to defeat plaintiff's claim, nor do they contend on appeal that the payment of such a commission is illegal. Furthermore, it may be noted that if plaintiff were in fact entitled to such a commission, there would be no consideration for the purported modification agreement. (*Peachy* v. *Witter*, 131 Cal. 316, 319 [63 P. 468].)

San Jose. The record discloses that in the early part of 1952, McClellan owned all the stock of Panelcrete and he had then also acquired all the stock of B&M. McClellan became president of Panelcrete, the same office he held with B&M. The offices of Panelcrete were virtually identical with those of B&M, except that plaintiff was made vice president of Panelcrete in the fall of 1952 so that he would have authority to execute contracts. Some of the jobs which B&M had undertaken around San Jose were transferred or assigned to Panelcrete by B&M at McClellan's direction. Plaintiff's duties with respect to Panelcrete's operations "fell within the same pattern" as his functions in San Jose for B&M prior to Panelcrete's existence.

The evidence further showed that while plaintiff was supervising Panelcrete's operations he was never relieved of his title of sales manager for B&M. He continued to so designate himself with McClellan's knowledge. He received his salary at all times not from Panelcrete, but from B&M, and his living quarters, the cost of meals, and the use of a car were provided him by B&M while he was in San Jose. He received commissions on sales made by B&M before and after he was sent to San Jose. In communicating with McClellan, plaintiff referred to his San Jose assignment as "the Panelcrete branch of Buttress and McClellan."

Until early in 1952, B&M was working on the Convair project under the Letter of Intent. The definitive contract was drawn up in final form and signed by B&M and Convair on January 15, 1952. However, the parties agreed that the date of the contract should appear as of July 20, 1951, to correspond with the date of the Letter of Intent. This latter date was therefore inserted in place of the date on which the contract was actually signed. The total cost of the Convair project was about $18,234,000. Under the fixed fee formula based on percentage of actual cost provided in the contract, B&M earned $435,219.90 as its fee for designing and constructing the plant.

In June, 1953, plaintiff severed his connection with Panelcrete and B&M. The Convair project was completed sometime prior to July 14, 1953. No commission was paid to plaintiff on that job. Plaintiff thereupon instituted the present action to recover commissions owing him under his contract of employment. In accordance with the jury's verdict, plaintiff was awarded a judgment in the sum of $44,723.90 against B&M, Panelcrete and J. E. McClellan.

The principal ground upon which the majority opinion bases its reversal is that as a matter of law it must be held that the total price of the Convair project could not be encompassed in the term "gross sales" as used by the parties. The majority holds that as a matter of law it was error to award plaintiff any commissions on the total cost of the Convair project because it was merely a contract for work and services and not a sale within the meaning of plaintiff's employment contract. As a corollary, it holds that because B&M received only a fee of $435,219.90, plaintiff's commission, as a matter of law, must be limited to a percentage of that amount. It derives this result by assuming—contrary to the implied finding of the jury—that the term gross sales "was actually the equivalent of 'gross receipts.' " But by this interpretation what the majority is actually doing is to equate the words "gross sales" with "gross profits." For as McClellan himself testified, the B&M fee on the Convair deal was its gross profit on the job. I regard it as entirely unwarranted to arbitrarily ascribe to the term "gross sales" the circumscribed meaning arrived at by the majority. And the law is certainly otherwise.

The term "gross sales" cannot be said to convey the same definite and inflexible significance under all circumstances and whenever used. Its meaning depends on the connection in which it is employed and the result intended to be accomplished. (*Commeford* v. *Baker,* 127 Cal.App.2d 111, 117 [273 P.2d 321] ; *W. F. Boardman Co.* v. *Petch,* 186 Cal. 476, 482 [199 P. 1047].) As stated in *Commeford* v. *Baker, supra,* page 120: *"The understanding of the parties as to the meaning of the term 'gross sales' cannot be determined as a matter of law. . . .* Evidence should be received and all facts should be considered which would aid the court in reaching a decision as to the meaning the parties attributed to the term 'gross sales.' The duty of interpretation is that of the trial court." (Italics added.)

The B&M corporation was not engaged in the business of an ordinary vendor of property, real or personal. Its function was to procure business on a "package deal" basis wherein, at an agreed price, it would furnish its client with industrial buildings or facilities commensurate with its needs. In so doing it gave counsel to prospective clients and formulated proposed plans, it provided the preliminary engineering and architectural services, it arranged for the procurement of labor and materials and it supervised the construction of the entire project to its conclusion. Its business, in effect,

was the sale of its integrated "know how" to industrial clients desirous of erecting new or expanded physicial facilities. Its salesmen searched out and endeavored to obtain contracts for the design and construction of industrial projects.

In the instant case, it was for the jury to ascribe to the term that meaning which would make it conform to the intent of the parties. (*Commeford* v. *Baker, supra.*) The jury unquestionably concluded that the Convair contract was a sale in consonance with the type of business B&M was engaged in, and that the total cost of the project was the "gross sales" yardstick by which plaintiff's commission was to be measured. This was an entirely reasonable determination of a factual question. The Convair project was the general type of undertaking B&M characteristically engaged in, although larger than any it had previously done. It was apparently considered a "sale" by McClellan, within the contemplation of the agreement, for he testified he told plaintiff he could not pay him a commission on the Convair deal because it would be illegal to do so, not because it was not a "sale."

The mere fact that the contract price was to be arrived at on a cost-plus fee basis did not as a matter of law transmute it into a category outside the pale of the commission agreement. The usual methods for paying for construction work are by lump sum, by item charges, or by cost plus a fee based on a percentage of costs. In a lump sum contract, the contractor makes up a bid from his knowledge of the cost of materials, cost of labor and the particular engineering and architectural specifications of the job, adding thereto a sum which will represent his profit. Such bid is ordinarily final, any changes being the subject of settlement between the owner and contractor. Whether the contractor's profit is larger or smaller than he anticipated, or whether he makes any profit at all, depends on how favorably anticipated conditions turn out to be. Under the cost-plus fee contract, the risk of loss inherent in the lump sum contract is minimized, the owner being charged all proper costs but receiving the benefit of favorable conditions which might reduce anticipated costs, while the contractor's profit is derived from the percentage of cost which makes up his agreed fee. In the one case, the contractor's anticipated profit is an item included in the bid made for the work; in the other it is included in the amount finally fixed as his fee when the cost of the completed project is ascertained. But under either system, where an employee's compensation agreement is based on "gross sales," the trier

of fact is entitled to compute such commission on the basis of the total cost of the project to the client where it finds this corresponds to the intent of the parties. The jury was not required to limit plaintiff's commission to .0025 per cent of $435,219.90, which was B&M's fee, and constituted its gross profits on the job. There was no testimony that the amount of plaintiff's commission was a percentage of gross profits; his percentage was based on "gross sales," which has no relationship to profits. On all other projects plaintiff was paid his commission on the total cost of the job; he even received commissions on such basis on jobs which lost money.

It was therefore entirely proper to use the total cost of the Convair project as the figure upon which plaintiff's commission was to be calculated. This is further borne out by the practical construction McClellan himself put on the contract when he allegedly told plaintiff it would be illegal to pay him a commission. Clearly it could not be considered illegal for B&M to pay an employee any amount it wanted out of its own profits (the fixed fee) on the job. The document offered by McClellan in support of his belief was Exhibit F, the Armed Forces Procurement Regulations. This was properly excluded as irrelevant, since it does not purport to indicate that commissions to an employee of a contractor are illegal, but simply that a commission paid was not an item for which the contractor would be reimbursed by the government on a cost-plus type contract. So it is reasonable to infer that McClellan was thinking of the entire contract cost when he purportedly told plaintiff that he could pay him no commission. To uphold the majority view, that no more than the amount of B&M's fee could be taken into consideration by the jury, would compel us not only to decide as a matter of law what was intrinsically a question of fact but would also distort the meaning of the term "gross sales" as used in this factual context to something less than the totality which its use imports.

The majority opinion attaches significance to the fact that plaintiff "never made any claims to a commission" on the Convair job. It fails to note, however, that this job was not completed until approximately a month after plaintiff's employment was terminated. His right to commission, of course, did not finally accrue until the project was completed.

Defendants' contention that the court committed prejudicial error in failing to instruct the jury as to what constituted gross sales within the meaning of the agreement is

specious. As the majority concedes, "all such instructions requested by defendants were inept and properly denied for that reason." The trial judge is under no duty to revise inadequate, improper or erroneous instructions to make them state the law correctly. (*Tossman* v. *Newman*, 37 Cal.2d 522, 525 [233 P.2d 1]; *Austin* v. *Riverside Portland Cement Co.*, 44 Cal.2d 225, 235 [282 P.2d 69].) The jury was instructed that if plaintiff was entitled to recover he should receive "one quarter of one percent of all the sales made by the defendants." They were told that "if there is any uncertainty in the contract the acts of the parties under the contract afford one of the most reliable means of arriving at their intention" and that "the construction thus given to a contract by the parties before any controversy has arisen should, when reasonable, be adopted." The jury was sufficiently oriented with respect to the fact that there was ambiguity regarding the amount of compensation to which plaintiff was entitled. Nothing would have been added to their deliberations by instructing them that "gross sales" could either be construed as the total cost of the project or the amount of the fee B&M received. For this is the question they must in all events inevitably have considered in arriving at their verdict. The phrase "gross sales" could not have been defined for the jury as a question of law since this was a pure question of fact—there being no unalterable or immutable definition of the term as a proposition of law.

Defendants' argument that plaintiff was not entitled to a commission on the Convair deal because that contract was signed in January, 1952, at which time plaintiff was working for Panelcrete in San Jose, is unfounded. The short answer to this is that B&M dated its agreement July 20, 1951, at which time there is no question plaintiff was a B&M employee. "The time at which an instrument becomes operative or has the legal effect for which it is made is its date." (*Knight* v. *City of Los Angeles*, 26 Cal.2d 764, 771 [160 P.2d 779].) It is fundamental that where parties to an agreement provide that a written contract be entered into as of an earlier date than that on which it is executed, the agreement is effective retroactively as of the earlier date. (*Wright* v. *Prudential Ins. Co.*, 27 Cal.App.2d 195, 219 [80 P.2d 752]; *Bremer* v. *National Surety Corp.*, 119 F.2d 926, 928.)

Furthermore, under the evidence the jury could have impliedly found that despite plaintiff's transfer to San Jose to supervise Panelcrete's operations, he remained, neverthe-

less, an employee of B&M under the original agreement and that he was entitled to commissions until termination of his employment in June, 1953. Plaintiff testified that the original oral agreement as to the amount of his compensation was never changed and he denied that any other remuneration agreement was in effect. This was undoubtedly believed by the jury despite contrary testimony. Although plaintiff was ostensibly a Panelcrete official, the evidence was such that the jury was warranted in disregarding the corporate entity of Panelcrete and impliedly finding that it was merely an instrumentality or business conduit of B&M and that plaintiff continued to be employed under his original contract despite his transfer to a new arena of activity under a different corporate entity.[2]

However, I agree with the contention that liability should not be fastened upon Panelcrete or McClellan, individually. It is true, of course, that because the individual and his corporate *alter ego* have identical duties and obligations (*Wenban Estate, Inc.* v. *Hewlett,* 193 Cal. 675, 697 [227 P. 723]; *Llewellyn Iron Works* v. *Abbott Kenney Co.,* 172 Cal. 210, 214 [155 P. 986]), it is often appropriate to bind both under a liability incurred by either. (*Gordon* v. *Aztec Brewing Co.,* 33 Cal.2d 514, 522-523 [203 P.2d 522]; *Mirabito* v. *San Francisco Dairy Co.,* 8 Cal.App.2d 54 [47 P.2d 530]; *Thomson* v. *L. C. Roney & Co.,* 112 Cal.App.2d 420 [246 P.2d 1017].) However, it is unnecessary to go so far in the instant case. There is no suggestion that B&M is insolvent or that it could not respond to the judgment or that fraud or injustice would occur unless Panelcrete and McClellan were also bound. "The fact that the corporate entity has been disregarded for some purposes does not warrant its being disregarded for all purposes." (*Grant* v. *Weatherholt,* 123 Cal.App.2d 34,

---

[2]The jury had before it evidence (1) that McClellan was president of both corporations; (2) that McClellan owned all the B&M stock early in 1952; (3) that he was the dominant stockholder of Panelcrete at the time of its formation and early in 1950 acquired all its stock; (4) that both corporations used the same offices; (5) that both corporations had substantialy the same officers; (6) that contracts of one were transferred to the other with no apparent consideration; (7) that McClellan dominated and controlled the policies of both corporations; (8) that Panelcrete was simply used as an instrumentality for carrying on the Northern California operations of B&M; (9) that after McClellan sent plaintiff to San Jose, B&M continued to pay his salary and other expenses while he was in charge of Panelcrete operations; (10) that McClellan allowed plaintiff to use the title of sales manager for B&M while he was managing Panelcrete; (11) that at no time was plaintiff paid by Panelcrete for his services.

39 [266 P.2d 185].) For that reason, I would amend the judgment by striking therefrom the names of Panelcrete and J. E. McClellan.

A brief word regarding defendants' assertion that the court erred in refusing to consider, on the motion for a new trial, the affidavit of Juror Alex Hahn and defendants' counsel. Reference is made in the briefs to the purported contents of these affidavits. However, they have not been included in the record on appeal and are not before the court for examination. Under such circumstances they may not be considered in proof of any fact therein stated and without them an appellate court cannot review the propriety of the order denying the motion for a new trial. (*Drummond* v. *Drummond*, 39 Cal.App.2d 418, 421, 422 [103 P.2d 217]; *Toomes* v. *Nunes*, 24 Cal.App.2d 395, 399 [75 P.2d 94].)

A petition for a rehearing was denied June 18, 1956. Fox, J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied July 18, 1956. Traynor, J., was of the opinion that the petition should be granted.