**1158**

Craig M. KOEHLER, an Individual,
et al., Plaintiffs and Coun-
terdefendants,

v.

MARCONA MINING COMPANY, a Ne-
vada Corporation, Defendant
and Counterclaimant.

Ismael COBIAN, Plaintiff,

v.

MARCONA MINING COMPANY et al.,
Defendants.

Nos. C–70 2510 AJZ and C–72 35 AJZ.

United States District Court,
N. D. California.

Aug. 29, 1973.

**1159**

Pillsbury, Madison & Sutro, Allan N. Littman, San Francisco, Cal., for defendants.

Sullivan, Jones & Archer, Richard J. Archer, San Francisco, Cal., for plaintiffs.

## MEMORANDUM OPINION AND ORDER

ZIRPOLI, District Judge.

These two consolidated actions concern iron-bearing deposits on the Marcona plateau in the Province of Nazca, Department of Ica, Republic of Peru.

Plaintiffs in case No. C–70 2510 AJZ are the two sons and the Trustees of the Estate of Henry J. Koehler ("Koehler") an American citizen and mechanical engineer who had resided in Peru and died there on July 31, 1961. Plaintiff in case No. C–72 35 AJZ is Ismael Cobian ("Cobian"), a Peruvian citizen and experienced mining engineer, who worked for three or four mining companies in South America, served as Director of the Peruvian Bureau of Mines, and later worked as a private consultant. He has made many trips to the United States and other foreign countries and has had experience in international finance.

The defendants in each action are Utah Construction Company ("Utah," now Utah International, Inc.), Marcona Mining Company ("Marcona"), assignee of Utah's rights under the contracts here involved, and Marcona Corporation, which was formed in 1965 as a result of the merger of Marcona Mining Company, Compania San Juan, and Associated Ocean Freight Services, Inc.

The court has jurisdiction under section 1332 of Title 28 United States Code.

Marcona entered into written contracts with Cobian and Koehler on February 12, 1954, and February 24, 1954, to remunerate them for their work in assisting in the negotiation by Utah (later Marcona) of a Concession Agreement with the Corporacíon Peruana del Santa ("Santa") for the commercial exploitation of the Marcona deposits. The contract with Cobian provides for the payment by Marcona to Cobian or his heirs of "four cents (4¢) lawful money of the United States for each long ton of *iron ore mined pursuant to the Concession Agreement and sold* (emphasis added)."[1]

The contracts defined the term "Concession Agreement" as the agreement of February 7, 1952, between Utah and Santa, and they provided that: "This agreement between Marcona and Cobian shall be in effect during the period of the Concession Agreement and any extension thereof, and any other agreements between Marcona, Corporacíon Peruana del Santa and/or Supreme Government of Peru with respect to the same mineral concession."[2] The agree-

---

[1]. Sales to Santa were excluded by paragraph 1 of the contract.

[2]. Additionally there was a proviso that: "This agreement supersedes all prior agreements and understandings, written or oral, between Utah Construction Company, Marcona and Cobian and their officers, employees and agents, and particularly the terms and conditions contained in that certain letter of Cobian to Utah Construction Company dated September 19, 1951."

The letter of September 19, 1951, was a letter from Cobian to Utah, which, subject to final approval of the Board of Utah, was endorsed by the signature of Edgar White, the representative of Utah, as evidence of Utah's "complete agreement with all what (sic) is herein stated." This letter was *intended by Cobian* to cover the manner in which he was to be remunerated for his assistance in negotiating contracts by Utah with Santa. The letter of agreement provided that for "each long ton (2,240 lbs.) of

ment recites as consideration for these payments that Cobian had rendered personal services incident to the negotiation of the Concession Agreement with Santa, which services inured to the benefit of Marcona. The parties further provided that the agreement "shall be construed pursuant to the laws of the State of California."

The contract with Koehler is essentially identical with that of Cobian, except that Koehler's annual payments on account of iron ore mined and sold in any one year were limited to $40,000 and the iron ore mined and sold in excess of 1,000,000 tons in any year would not result in any additional payment to Koehler.[3]

Marcona paid Cobian $1,314,675.80 and paid Koehler and Koehler's estate $552,967.36, all with respect to 32,866,895 long tons of iron ore mined from 1953 to 1967 pursuant to the Concession Agreement and sold. The Cobian complaint which was filed on *January 7, 1972*, alleges breach of contract, fraud, and mistake, and requests an accounting. Cobian claims that he should have been paid an additional $4,528,518.-56 with respect to an additional 113,212,964 long tons of iron-bearing material mined by Marcona from the Marcona deposits from 1953 to and including 1971, and that he should be paid four cents per long ton on all additional iron-bearing material mined by Marcona from the Marcona deposits in the future.

The Koehler complaint, which was filed thirteen months earlier, November 2, 1970, alleges a breach of contract and requests an accounting, apparently on the same basis as Cobian, but with a

$40,000 per annum maximum for each year, including those in the past.

*The essential dispute is over the meaning of the phrase "iron ore mined pursuant to the Concession Agreement and sold."*

*The Governing Legal Principles.*

■■ Before looking to the applicable California law to resolve this dispute, we start with the fundamental rule "that the burden of proof in its primary sense rests upon the party who, as determined by the pleadings, asserts the affirmative of an issue and it remains there until the termination of the action." Pacific Portland Cement Co. v. Food Mach. & Chem. Corp., 178 F.2d 541, 547 (9th Cir. 1949). *See also* Goldberg v. International Testing Corp., 30 F.R.D. 367, 368 (S.D.Cal.1962). This burden, as will be hereinafter seen, plaintiffs have failed to meet. To accord the plaintiffs the relief they seek would require the court to rewrite the contract by giving effect, *not* to the facts and circumstances existing at the time the contract was made, but to subsequent unforeseen events. This the court cannot do. Thomas v. Buttress & McClellan, Inc., 141 Cal.App.2d 812, 816, 297 P.2d 768 (1956).

The pertinent provisions of the California Codes governing the interpretation of the Koehler and Cobian contracts are:

California Civil Code § 1636. Mutual intention to be given effect
*Contracts, How To Be Interpreted.*
A contract must be so interpreted as to give effect to the mutual intention of

---

iron ore of the Marcona deposits" mined out of the property of the Corporacíon and exported or sold to third parties in Peru, he would receive "Four cents ($0.04) of One Dollar" with the express stipulation that payments would not be made to him until the ores exported or sold were paid for. This understanding of Cobian in September, 1951, is of some import to the court's determination of the intent of the parties in February, 1954.

3. The only other difference was the fact that Koehler's contract, unlike Cobian's, made no provision for payment to Koehler's "heirs." This omission is no longer relevant since defendants have conceded that the contract inured to the benefit of Koehler's heirs and that their counterclaim based on payments made to the representatives of Koehler may be dismissed.

the parties *as it existed at the time of contracting*, so far as the same is ascertainable and lawful. (Emphasis added)

California Civil Code § 1638. Ascertainment of intention; language

*Intention To Be Ascertained From Language.* The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.

California Civil Code § 1639. Ascertainment of intention; written contracts

*Interpretation Of Written Contracts.* When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; *subject, however, to the other provisions of this Title.* (Emphasis added)

California Civil Code § 1642. Several contracts as parts of one transaction

*Several Contracts, When Taken Together.* Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together.

California Civil Code § 1648. Circumstances

*Contracts Explained By Circumstances.* A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates.

California Civil Code § 1648. Restriction to object

*Contract Restricted To Its Evident Object.* However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract.

California Civil Code § 1654. Uncertainty, interpretation against party causing; presumption

*Words To Be Taken Most Strongly Against Whom.* In cases of uncertainty *not removed by the preceding rules*, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be such party; . . . (Emphasis added)

California Code of Civil Procedure § 1860. Construction of instruments; consideration of circumstances

*The Circumstances To Be Considered.* For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the Judge be placed in the position of those whose language he is to interpret.

California Code of Civil Procedure § 1861. Terms of writing; presumption as to use; evidence of local, technical or other signification.

*Terms To Be Construed In Their General Acceptation.* The terms of a writing are presumed to have been used in their primary and general acceptation, but evidence is nevertheless admissible that they have a local, technical, or otherwise peculiar signification, and were so used and understood in the particular instance, in which case the agreement must be construed accordingly.

█ Applying the foregoing rules of interpretation of contracts to the evidence in this case, for the reasons hereinafter stated, the court in its practical construction of the Cobian and Koehler contracts with Marcona concludes that the language of the contracting parties as it relates to the matter which gave rise to these contracts (the exploitation of Marcona deposits under the Concession Agreement between Marcona and Santa), the circumstances under which the contracts were made, the then situation of the parties to the contracts and their relationship one to the other and

with Marcona and Santa, and their conduct before and at the time of the negotiation of the contracts and for many years thereafter in the course of Marcona's performance under the contracts, *all consistently* demonstrate that Koehler and Cobian were to be paid (and were in fact paid) only with respect to iron ore having 50 percent or more of iron and not more than 0.5 percent of sulphur.

## The Relevant Extrinsic Evidence.

■ For the judge to be in the position of those whose language he is asked to interpret nearly twenty years later, he must look to all the relevant circumstances under which the contracts were made at the time they were made. Some of these circumstances have been alluded to in the paragraph immediately above.

The undisputed testimony shows that the presence of iron deposits at Marcona had been well known since 1870, yet efforts to commercially exploit these deposits were without success until 1953. Attempts prior to 1951 to interest Japanese and American steel mills in the developing (or financing of development) of these deposits were unsuccessful, primarily because such firms wanted iron ore with very low sulphur content. This requirement of the steel mills was well known to both Koehler and Cobian.

In March, 1951, Cobian and Koehler and Takahashi, an iron ore broker who had been unable to interest Japanese and American firms in these deposits, obtained from Santa a 90-day option to find a mining company to mine and export 10,000,000 tons of direct-shipping ore (ore *not needing roasting or sintering or other beneficiation*) at Marcona. It is thus clear from the beginning of this relationship between Koehler and Cobian that they contemplated only the

mining and sale of direct-shipping ore. Furthermore, they both knew that the 1951 proposals and counterproposals between Santa and Utah leading to the February 7, 1952, agreement contemplated only the mining and sale of direct-shipping ore. Koehler and Cobian at the time were well aware of the difference between direct-shipping ores and concentrated or beneficiated ores.

In the period 1951–1952 Cobian and Koehler both knew that the Marcona deposits consisted of a top leached zone, consisting of at least ten million tons of direct-shipping iron ore (ore with not more than 0.5 percent sulphur content), and that below the leached zone was a large deposit of high-sulphur iron-bearing materials which would need sintering, and hence, were not acceptable as direct-shipping ore. At that time the only ore which was considered to have *commercial value* was that which did not need roasting or sintering.

On February 7, 1952, Utah and Santa, with the intervention and approval of the Supreme Government of Peru, entered into an exploration and exploitation agreement which was duly entered in the Register of Public Deeds. Under the agreement Utah was granted a six to nine month period to explore the mineral reserves at Marcona in order to determine whether it wished to enter into the exploitation provisions of the agreement. Clause Eleven of the agreement [4] gave Utah the right to export a percentage of the cubicated reserves of iron ore defined as that which *did not demand roasting* (sintering). The percentage was one out of every three tons cubicated (estimated) *for the first 30,000,000 tons* and one out of every two tons cubicated for the excess. Nothing else was considered to be iron ore. The agreement did not give Utah the right to sell,

---

4. The pertinent provision of Clause Eleven provides: "The minimum [everyone agrees the word maximum was intended] tonnage of *ores to be exported* shall be in proportion to the cubicated reserves and shall be at the rate of one ton exported for every three tons cubicated up to a cubication of 30 mil-

lion long tons, and one ton exported for every two cubicated, for the excess. In order to compute the reserve tonnage, there *shall not be included in this ore, that which demands roasting* (sintering)." (Emphasis added)

or beneficiate and sell, any other iron ore than the ore defined above. While the agreement gave Utah the preferential right to exploit all minerals, as to "iron ore," the direct object of the agreement, the only iron ore that could be mined and sold by Utah was expressly limited by this Clause Eleven. Peruvian law was to govern the meaning and interpretation of the agreement. Koehler and Cobian were well aware of the terms of this agreement, since they were bing compensated for personal services incident to the negotiation of the agreement.

Between February, 1952, and January, 1953, Santa and Utah explored the iron ore deposits at Marcona and exchanged estimates of the quantity of iron ore in those deposits on the basis of including *only* iron bearing material with 50 percent or more of iron and not more than 0.5 percent of sulphur. That definition of iron ore was expressly incorporated into Clause Four of the November 7, 1952, contract between Santa and Utah for the exploitation of the Marcona iron bearing deposits. Clause Four provides:

> In accordance with the terms of the contract of February seven, one thousand nine hundred and fifty two, this reserve tonnage is distributed in the proportion of forty million tons for domestic use and thirty million tons for export. On the foregoing estimates iron ore has been *defined* as an ore that contains fifty per centum or more of iron and not more than zero point five percentum of Sulphur." (Emphasis added)

The agreement between Santa and Marcona (now assignee of Utah) of May 13, 1973, which extended the period during which Marcona could exploit the Marcona deposits from twenty-one years to thirty years, in no way changed the definition of iron ore. Clauses Five and Six of the May 13, 1953, agreement specifically stated that ores which required roasting were excluded from exploitation under Clause Eleven of the February, 1952, contract, but noted that some of these could nevertheless be mixed with

much lower sulphur ores to obtain an average of less than 0.05 percent sulphur ore for sale, and in order to justify the expense of installing a mixing plant (not a roasting or beneficiation plant), granted a nine-year extension of the agreement.

■ Plaintiffs attempt to avoid these definitions of iron ore in the Santa agreements of February 7, 1952, November 7, 1952, and May 13, 1953, by arguing that they applied only to the reserves which Utah was to establish and had no effect on the term "iron ore mined pursuant to the Concession Agreement and sold" as used in the agreements between Marcona, Cobian and Koehler. These agreements incorporate the definitions of iron ore in the Concession Agreement by the phrase "mined pursuant to the Concession Agreement and sold." At the time of the Cobian and Koehler agreements, there was a clear definition of iron ore between the parties to the Marcona Concession Agreement. It was, as is evident from Clause Four quoted above, "an ore that contains fifty per centum or more of iron and not more than zero point five percentum of Sulphur." Nothing else was defined as iron ore, and the right to export iron ore as so defined was, by Clause Eleven of the February 7, 1952, contract read with Clause Four of the November 7, 1952, contract, based upon iron ore reserves so defined. *The definition of iron ore for reserves was the definition of iron ore for export.* The intent thus manifested in the 1952–1953 agreements between Santa and Utah-Marcona shows that, whatever the state of the art or trade in other areas of the world, Santa and Marcona considered only those iron-bearing materials in the Marcona deposits with a minimum of 50 percent iron and a maximum of 0.5 percent sulphur to be iron ore and the object of commercial exploitation under the Concession Agreement. These agreements make no provision whatever for the kind of beneficiation facilities which were later conceived and built at great cost under an

entirely different contractual relationship entered into with Santa on February 26, 1960.

Santa and Marcona manifestly thought and acted on the basis that the 1952–1953 agreements did not provide for the exploitation of low-grade materials when in 1960 they made their new agreement expressly providing for the exploitation of such material. In their 1960 agreement, Santa and Marcona:

1. Classified the low-grade materials as Class B ore and expressly distinguished them from Class A ore;

2. Defined Class A ore, exactly as iron ore had been defined in the November 1952 agreement, as containing 50 percent or more of iron and no more than 0.5 percent of sulphur;

3. Expressly stated that the exploitation of Class B ore refers to a large tonnage of ore "that is not susceptible to economic and commercial exploitation by means of the existing installations at the port of San Juan which, in the contracts in force, were provided only for the ore with 50 percent or more of iron and no more than 0.5 percent sulphur."

The 1960 agreement would have been unnecessary if the 1952–1953 agreements had actually provided for the exploitation of ore containing less than 50 percent iron and more than 0.5 percent sulphur. A new agreement was necessary. It provided for a $22,000,000 investment in a beneficiation plant with a capacity of 2,000,000 long tons of product per year, port works, an electric power plant, water and sewage installations and roads, and provided, contrary to the 1952 contract, that such facilities shall remain the property of Marcona. As Mr. Cobian admits, the 1952–1953 agreements did not contain provisions necessary for the exploitation of low-grade, iron-bearing materials.

When Cobian and Koehler made their arrangements with Marcona in February, 1954, they knew that the estimates were that there would be 30,000,000 tons for export, leaving 40,000,000 tons for the Peruvian National reserves. These estimates, and expectations that they would be paid only on these estimates, as will hereinafter appear, formed the basis of Koehler's proposal that Marcona pay him a lump fee of approximately $400,000 for his services and Cobian's agreement with his partner, Garland (and the Garland heirs), as to Garland's share of Cobian's receipts.

It should also be noted that the November 7, 1952, contract gave Utah three months within which it could decide not to exploit the Marcona iron ore deposits. This requested extension of time was needed because Utah was unwilling to undertake the risk without a partner and a sales contract. Before the partner, Cyprus Mines, would join in the venture, it had to make, and did make, an independent investigation to ensure that the ore deposits to be exploited contained the required maximum percentages of iron and the required minimum percentage of sulphur, which percentages in turn depended primarily upon an agreement with United States Steel for the purchase of approximately 5,000,000 tons of iron ore having no more than 0.-25 percent sulphur over a period of two years. Cobian was aware of this extension and the reasons therefor, which he transmitted to Santa. Cobian was thus aware that only cheap, open-cut mining was being considered and that only low-sulphur ore was considered marketable, thereby making it reasonable, if not mandatory, that the 0.5 percent sulphur figure be included as an outside limit in the November 7, 1952, contract.

■ A further consideration in determining the meaning of the phrase "iron ore mined pursuant to the Concession Agreement and sold" in 1954 is the then North American and South American word usage of the words "iron ore."

In North American trade usage at the time, the words "iron ore" referred to a natural occurring, iron bearing mineral assemblage from which iron can be removed at a profit. The element of profit includes considerations of location, grade, quantity, depth and the presence of impurities in accordance with exist-

ing technology and economics. These are the very considerations that led to the definition accorded iron ore in Clause Four of the November 7, 1952, contract.

The phrase "iron ore mined and sold" means the selling of material that is mined and, at most, subject to primary crushing and screening, i.e., direct-shipping ore. It does not mean the pulverizing of the raw material into fine particles, and the agglomeration and reconstruction of the purified particles for shipment and use in a blast furnace. Such processes were properly called beneficiation. Had the definition of iron ore included beneficiated ore there would have been no need to incorporate into the February, 1960, contract a provision for Grade B ore (beneficiated ore).

Similarly in Latin American mining usage, there is a clear distinction between iron ore (mineral de hierro) and iron concentrates, pellets or agglomerates (concentrado, peleta, agglomerado). The latter are collectively referred to as "mineral de hierro beneficiado." It follows that the phrase "mineral de hierro esportada o vendida" means "iron ore exported or sold," and does not include concentrates or pellets.

Of substantial significance to the interpretation of Cobian's February 12, 1954, agreement with Marcona and a proper appraisal of Cobian's testimony at the trial is his relationship and dealings with Garland and the Garland heirs, who were to share with Cobian in his receipts under the contract. Cobian engaged Alejandro Garland Roel in June, 1951, to explain the important details of the proposed Utah-Santa concession agreement to various Peruvian governmental officials who had to approve it. Cobian gave Garland the information necessary to explain the important details of the concession agreement, which included the meaning of the phrase "ore that demands roasting (sintering)." Cobian originally contemplated that Garland would be paid $50,000 for his services.

As already noted, on September 19, 1951, Cobian had sent a letter to Utah confirming their agreement for his remuneration at four cents per ton of iron ore (mineral de hierro) exported or sold from Marcona. Cobian's letter referred only to iron ore. It does not specifically refer to pellets, concentrates or other beneficiated products, nor does it otherwise intend to cover such products.

On October 1, 1951, Cobian and Garland entered into a written agreement under which Cobian agreed to pay Garland 30 percent of whatever compensation Utah should pay to Cobian for their efforts relating to the signing of a contract *"for the sale of iron ores (para la venta de minerales de hierro)"* between Utah and Santa. The conditions of the payment *"in form and terms, are found in the letter dated September 18* [obviously referring to the letter of September 19] *that I sent to The Utah Construction and which I am pleased to enclose in this letter."*

On October 22, 1953, Cobian and Garland by a written agreement "clarified and substituted" a new agreement for their October, 1951, agreement. This new agreement reduced Garland's share of Cobian's receipts from 30 percent to two-thirds of a cent per ton and provided that Garland was to be paid for "each long ton of ore, Bessemer type" exported by Marcona. Cobian and Garland intended that Garland was to be paid on the same tonnage as Cobian was paid by Marcona. By the term "iron ore, Bessemer type," Cobian and Garland, in their clarifying letter, meant the iron ore defined in the Fourth Clause of the Santa-Utah November, 1952, agreement. There is no other reasonable inference that can be made. Cobian had read the Brassert Report (relied upon in great measure by all parties to the concession agreement), knew that it described the Marcona deposits down to 50 feet as "adequate for Bessemer" and at the trial he admitted that this is a Bessemer type ore.

Later, in 1958, when Cobian and Garland were negotiating for the purchase

by Cobian of Garland's interest, Cobian sought to value Garland's interest on the basis of the remaining ore and obviously referred to direct-shipping or Bessemer type ore of limited quantity. After Garland's death in 1959, Cobian, in May, 1961, entered into written agreements with the Garland heirs specifically recognizing his and the Garlands' interests were limited to Bessemer type iron ore of approximately 30,000,000 tons. It is thus clear to the court, and the court finds, that when Cobian and the Garland heirs made their May, 1961, agreement, they intended by the phrase "iron ore Bessemer type" to describe their rights and understood that they had no rights to ores to be processed and beneficiated under the February, 1960, agreement between Marcona and Santa. That agreement had been in existence for over a year. The first stage of the beneficiation plant was almost completed. It was widely known that the beneficiation plant would shortly produce for export a large volume of concentrates and pellets, and the volume of iron concentrates and pellets was expected to rise to eight million tons a year through successive expansions of the beneficiation plant.

Cobian's contemporaneous conversations and conduct confirm his understanding with the Garlands that they, as he, were entitled only to payments on direct-shipping ore, i.e., Bessemer type ore. Whether the May, 1961, agreement betwen Cobian and the Garland heirs was, as stated in the agreement, a cancellation of the obligation, and therefore a purchase, or, as Cobian argues, a mere advance, the transaction clearly recognizes that Cobian and the Garlands claimed rights on a limited quantity (30,000,000 tons) of ore of a particular type and not in a practically unlimited quantity (500,000,000 to 600,000,000 tons) of ore to be beneficiated. In this respect the court finds it significant that the amount Cobian agreed to pay, whether a purchase or advance, came to exactly $58,205.39, which to the last penny was the amount that would be due the Garlands on the unmined balance of 30,000,000 tons or iron ore.

Another significant fact that reasonably indicates that Koehler expected to be paid only on iron ore defined under the Utah-Santa agreement of November 7, 1952 (iron ore mined pursuant to the concession agreement and sold and later referred to as Class A ore), is the fact that in 1953, and again in 1954, Koehler proposed to Marcona that it pay him a lump-sum fee of approximately $400,000 for his services, a fact that he reiterated in 1961 to a United States Internal Revenue Service Agent. He ultimately agreed to a $40,000 per annum maximum on his payments. It is reasonable to infer, and the court finds, that Koehler would not have been so eager to make this proposal had he believed his contract covered more than direct-shipping ore.

Finally the court finds it quite significant that after the February 26, 1960, contract between Marcona and Santa for the beneficiation of high-sulphur ore, described as Class B ore in distinction to Class A ore defined as that covered by the contracts then in force, Marona sent Cobian thirty-one and Koehler and Koehler's estate at least three statements for Class A iron ore tonnage. Cobian knew that "Class A iron ore" meant a particular grade of iron ore, distinguished from other grades. If he had not known what it meant, he would certainly have taken steps to find out what it meant. In his testimony in answer to questions of the court, he first stated that he was curious to find out what the phrase meant, and that he asked Marcona what it meant, but when it was established by his own admission that he did not ask anyone at Marcona what the phrase meant, he attempted to say that he was not curious. Koehler, too, knew or should have known what Class A iron ore meant. Between 1961 and 1970, Marcona produced and sold under its 1960 and subsequent agreements with Santa and the Government of Peru, 65,420,135 long tons of prod-

ucts from Class B ore on which no payments were made to Koehler or Cobian. Thus as early as 1962, and continuously thereafter, Cobian knew that he had not been paid on Class B ore or the concentrates produced from it. Despite Cobian's knowledge of declining payments and statements on Class A tonnage from 1962 onward, he commenced no lawsuit, filed no claim, and wrote no letter or memorandum between 1960 and September, 1971, asserting any right to any payment with respect to beneficiated iron products produced by Marcona under the 1960 and subsequent contracts between Marcona and Santa, nor did his partners, the Garlands. Indeed, Cobian never even advised the Garlands that he commenced his lawsuit.

*Fraud Claim.*

 Cobian's claim of fraud is without merit. Even if he was promised in 1964 a copy of the February 26, 1960, contract between Santa and Marcona, a failure to keep such a promise would not amount to fraud. Moreover, Cobian testified that he did not want a copy, and if he wanted a copy, he could have obtained it.

*Conclusion.*

The foregoing findings, which include the negotiations of the parties, the surrounding facts and circumstances, the language of the Koehler, Cobian, Santa-Utah-Marcona, and Garland agreements, the practical construction of those agreements, and the conduct of Cobian and Koehler at all relevant times, consistently demonstrate, as previously stated herein, that Koehler and Cobian were to be paid *only* with respect to iron ore having 50 percent or more iron and no more than 0.5 percent sulphur. They have been so paid. Defendants did not breach their contracts with Koehler and Cobian. Defendants are entitled to judgment in their favor and against plaintiffs on all claims of plaintiffs.

In view of the disposition herein made of these cases, the court need not and does not rule on the defendants' defenses of statute of limitations, accord and satisfaction, waiver and estoppel.

The counterclaim of Marcona against the Koehler plaintiffs is dismissed.

The foregoing opinion constitutes the court's findings of fact and conclusions of law as required by Federal Rules of Civil Procedure Rule 52(a). Judgments as herein ordered shall be entered forthwith. Defendants shall submit forms of judgment in accordance with Local Rule 123.

